**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| VEHICLE MARKET RESEARCH, INC., Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 09-CV-2518 JAR/GLR |
| MITCHELL INTERNATIONAL, INC., Defendant. | ) | |

## COMPLAINT

Plaintiff Vehicle Market Research, Inc. ("VMR"), for its Complaint against Defendant Mitchell International, Inc. ("Mitchell"), states and alleges as follows based on present knowledge, information, and belief:

### Nature of the Case

1. VMR developed an innovative, groundbreaking software concept for the auto insurance industry that would provide adjusters the ability to obtain more accurate valuations of vehicles when adjusting or settling a total loss claim. VMR entered into an agreement with Mitchell in which VMR agreed to develop this concept of a "total loss settlement system" into a "TLSS Product" that could be marketed primarily to auto insurance carriers. Among other things, Mitchell was obligated to market the software to customers in the auto insurance industry and to pay VMR royalties on the revenue from and/or the use of the product. Pursuant to the agreement, VMR created the software, and Mitchell marketed it and began paying royalties. However, in late 2005, Mitchell began marketing the TLSS Product under a new name and improperly ceased making the royalty payments due to VMR. Mitchell owes VMR over $4 million in royalties.

**The Parties**

2. VMR is a corporation organized under the laws of the State of Kansas.

3. Mitchell is a corporation organized under the laws of the State of Delaware with its principal place of business in San Diego, California.

4. Mitchell represents itself as is a leading provider of information, workflow, and performance management solutions to improve business processes for insurance companies and collision repair facilities.

5. According to its web site, http://www.mitchell.com, Mitchell serves over 30,000 collision repair facilities, independent adjusters, other "repair chain" participants, and 250 insurance companies, including eight of the nation's top ten carriers.

6. Mitchell provides its products and services to customers in Kansas.

**Jurisdiction and Venue**

7. This Court has jurisdiction over this action under 28 U.S.C. § 1332 because this action involves a dispute between citizens of different states and the matter in controversy exceeds $75,000.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Kansas, and because the defendant is subject to personal jurisdiction in this judicial district. Furthermore, Defendant has submitted to personal jurisdiction in Kansas pursuant to Kan. Stat. Ann. § 60-308 by entering into an express contract with a resident of Kansas to be performed in part in Kansas, and by transacting business in Kansas.

## Factual Background

### Historical Automobile Insurance Industry Valuations and the Total Loss Settlement System Concept

9. In the automobile insurance industry, when assessing a vehicle deemed to be a "total loss," adjusters historically relied primarily on information available through two major databases—the CCC database and the ADP database—as well as industry recognized publications such as Kelley Blue Book, NADA and Red Book. CCC and ADP provided adjusters with valuations of vehicles derived from scanned newspaper advertisements and automobile dealer surveys and applied proprietary calculations to derive what is commonly referred to as a "take price."

10. Newspaper advertisements typically account for certain characteristics such as make, model, and year, but frequently do not account for mileage and optional equipment, features or condition. Moreover, the CCC and ADP databases did not disclose valuation information concerning actual market sales of vehicles, and were often viewed as unreliable, especially for older vehicles. For adjusters to obtain market data concerning actual sales of similar vehicles they often had to contact local car dealerships or take some other extra step to obtain market valuation estimates.

11. In the early 1990s, John Peter Tagliapietra conceptualized a total loss settlement system that would be a single software application, allowing insurance adjusters to use just one source to obtain electronically available information from several different electronic ancillary databases—including book value databases and additional information that was previously inaccessible such as mileage, optional equipment and other factors in the context of actual market sales of comparable vehicles—and, thus, improve efficiency and valuation accuracy in settling total loss claims.

## Early Development of the Total Loss Settlement System Concept

12. In the fall of 1995, Tagliapietra, who was working for Mitchell, discussed with Mitchell's executive management his new concept for a total loss settlement system. Mitchell decided not to pursue the development of Tagliapietra's total loss settlement system concept.

13. In early 1996, however, Mitchell offered Tagliapietra the opportunity to develop a total loss settlement system product independently of Mitchell while continuing to work for Mitchell, as long as Mitchell had a right of first refusal.

14. In January 1997, Tagliapietra formed VMR for the initial purpose of developing a new total loss settlement system product. VMR then developed its Total Loss Settlement System ("TLSS") prototype and presented it to Mitchell.

15. VMR's total loss settlement system compiled information from several ancillary databases, including, for example: title and odometer history of the total loss vehicle or any comparable data from CARFAX; guidebook information from national data sources, such as the National Automobile Dealers Association (N.A.D.A.), Red Book, and Blue Book; factory recalls and technical service bulletins; claim history from the National Insurance Crime Bureau (NICB); tax, title, and license fees by zip code from the Department of Motor Vehicles; and most importantly comparable vehicle data and market transactions from multiple independent databases (such as AutoTrader and Cars.Com).

16. The distinguishing aspect of the total loss settlement system was that it enabled the user to interface with multiple electronic ancillary databases to obtain data related to the value of a vehicle, including, but not limited to, actual market data, and compiled that data into a report. It completely eliminated the need to scan or rekey advertisements from local newspapers and vehicle for sale print publications.

17. Mitchell hired a consultant, Robert Douglas, to conduct a feasibility study and market research analysis for VMR's TLSS prototype. Douglas's study concluded that VMR's total loss settlement system was "one of the most attractive and innovative paradigms designed for the total loss market."

18. Later in 1997, Mitchell retained Douglas to create a business plan to work with VMR to further develop its TLSS prototype and create the product that Mitchell would ultimately sell or license to customers in the insurance industry.

**The Computer Programming and System Integration Services Agreement**

19. In March 1998, VMR and Mitchell executed a Computer Programming and System Integration Services Agreement, a true and correct copy of which is attached as Exhibit A (the "Agreement").

20. Under the terms of the Agreement, VMR agreed to "design, develop, maintain and support the Total Loss Settlement System (TLSS Product) based upon the VMR prototype system and the Mitchell/VMR product specifications." (Ex. A, Agreement, Schedule A, at 10).

21. In exchange for VMR creating and granting Mitchell an interest in the TLSS, Mitchell agreed to pay VMR in accordance with Schedule A of the Agreement. (Ex. A, Agreement, at ¶ 4.0).

22. Among other things, under Schedule A Mitchell was obligated to pay VMR royalties on all "Eligible Revenue," defined as "revenue collected by Mitchell from the sale or license of the TLSS Product as well as related Ancillary Databases." (Ex. A, Agreement, Schedule A, at 11).

23. The amount of the royalty payments Mitchell owed to VMR was based on the following royalty rate schedule: 10% for Year 1; 8% for Year 2; 6% for Year 3; 4% for Year 4; 3% for Year 5; and 2% thereafter. Mitchell was obligated to pay VMR a royalty on all Eligible

Revenue "until a maximum cumulative total of $3,500,000 is paid out." (Ex. A, Agreement, Schedule A, at 11).

24. Mitchell further agreed that "[i]n no event will the transaction royalty paid to VMR be less than $1.00 per transaction." (Ex. A, Agreement, Schedule A, at 11).

25. Mitchell agreed to make all royalty payments on a monthly basis in accordance with its standard financial and accounts payable policies. (Ex. A, Agreement, Schedule A, at 11).

26. Thus, under the terms of the Agreement, Mitchell was obligated to pay VMR royalties each month in accordance with the rate schedule or the $1.00 per-transaction royalty floor, whichever is larger.

**The Amendment to Schedule A of the Agreement**

27. In February 2002, the parties executed an amendment to Schedule A, a true and correct copy of which is attached as Exhibit B (the "Amendment").

28. Under the terms of the Amendment, the maximum cumulative total amount for royalty payments from Mitchell to VMR was increased from $3,500,000 to $4,500,000. (Ex. B, Amendment).

29. The Amendment also modified the rate schedule as follows: 10% for Year One (April 2000 through March 2001); 8% for Year Two (April 2001 through December 2001); 6% for Year Two (January 2002 through March 2002); 4% for Year Three (April 2002 through March 2003); and 2% for Year Four and beyond. (Ex. B, Amendment).

30. Under the terms of the Amendment, the remainder of the original Agreement, including, but not limited to, the royalty floor of $1.00 per transaction, continued "in full force and effect." (Ex. B, Amendment).

**Mitchell's Failure to Pay Royalties Due to VMR**

31. Pursuant to the Agreement, VMR created a total loss settlement system software product, the "TLSS Product," and delivered it to Mitchell.

32. Mitchell began marketing the total loss settlement system and, in May 2001, paid the first royalty check to VMR. Mitchell continued paying royalties on a monthly basis until the Fall of 2005, after which time all royalty payments ceased.

33. The total amount of all royalty payments made by Mitchell was only approximately $150,000 of parties agreed-total royalty obligation of $4,500,000.

34. In 2005, Mitchell began marketing the total loss settlement system under a different name. On information and belief, Mitchell's "new" version of the total loss settlement system product is substantially similar, if not identical, in all meaningful respects, to the innovative TLSS Product created by VMR and delivered to Mitchell pursuant to the Agreement.

35. For example, on information and belief, Mitchell's "new" version of the total loss settlement system incorporates, in whole or in significant part, the computer source code and other aspects of the TLSS Product created by VMR.

36. Mitchell continues to market total loss settlement system products, including, but not limited to, WorkCenter™ Total Loss ("WorkCenter™").

37. Mitchell's own statements indicate that its current products are total loss settlement system products. As described in the "WorkCenter Total Loss" section of Mitchell's web site, http://www.mitchell.com, WorkCenter™ is a "statistically-driven, fully automated, web-based, total loss valuation system." WorkCenter™ allows users to "run additional reports" from CARFAX®, NICB®, N.A.D.A. Official Used Car Guide®, and The Automobile Red Book™.

38. The TLSS Product VMR delivered to Mitchell pursuant to the Agreement performs these exact functions.

39. Mitchell's WorkCenter™ product allows the user to input a valuation request. WorkCenter™ can locate comparable vehicles, determine a valuation, and create an output valuation report.

40. Again, the TLSS Product VMR delivered to Mitchell pursuant to the Agreement performs these exact functions.

41. Mitchell is selling or licensing WorkCenter™ and possibly other total loss settlement system products without payment of any royalties to VMR.

42. VMR is entitled to monthly royalties based on either (a) all Eligible Revenue (as that term is defined in the Agreement) generated as a result of the marketing, sale or license of a total loss settlement system or (b) $1.00 per transaction performed on a total loss settlement system, whichever is greater.

43. Mitchell has not paid all the royalties it owes to VMR. Because Mitchell is in sole possession of the accounting records needed to determine the exact amount due to date, VMR is unaware of that exact figure, but if added to future royalties due, the total amount owing from Mitchell to VMR is over $4 million.

## COUNT I—BREACH OF CONTRACT

44. VMR realleges and incorporates herein by reference paragraphs 1 through 43.

45. VMR and Mitchell entered into the Agreement, as amended, which is a valid and enforceable contract.

46. VMR has fully and substantially complied with its obligations under the contract.

47. Mitchell has breached its contractual obligations by, among other things, continuing to use the total loss settlement system without paying royalties to VMR.

48. As a direct and proximate result of Mitchell's breach of the Agreement, VMR has suffered, and continues to suffer, direct and consequential damages, including but not limited to royalties due to date and future profits in excess of $4 million.

WHEREFORE, VMR prays for judgment against Mitchell; for an award of damages against Mitchell in an amount not yet calculated but exceeding $75,000; for costs together with prejudgment and postjudgment interest and attorneys' fees; and for such other and further relief in favor of VMR as the Court deems just and proper.

**COUNT II—BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

49. VMR realleges and incorporates herein by reference paragraphs 1 through 48.

50. Mitchell has an obligation of fulfill its contractual duties to VMR in accordance with its duty of good faith and fair dealing.

51. Mitchell has violated this duty by, among other things, continuing to use the total loss settlement system without paying royalties to VMR and without returning the TLSS Product to VMR.

52. As a direct and proximate result of Mitchell's violation of its duty, VMR has suffered, and continues to suffer, direct and consequential damages, including but not limited to royalties due to date and future profits in an amount in excess of $4 million.

WHEREFORE, VMR prays for judgment against Mitchell; for an award of damages against Mitchell in an amount not yet calculated but exceeding $75,000; for costs together with prejudgment and postjudgment interest and attorneys' fees; and for such other and further relief in favor of VMR as the Court deems just and proper.

**COUNT III—UNJUST ENRICHMENT**

53. VMR realleges and incorporates herein by reference paragraphs 1 through52.

54. VMR conferred benefits upon Mitchell, through the creation of the total loss settlement system.

55. Mitchell understood and appreciated the benefits conferred upon it by VMR. Mitchell further accepted the benefit and generated millions of dollars from it by marketing, selling and/or licensing the TLSS Product and ancillary databases to numerous customers.

56. Under the circumstances outlined above, it would be unjust for Mitchell to retain the use of the total loss settlement system, and any similar products, for sale or license, without payment to VMR of the agreed-upon royalty.

57. VMR has suffered and continues to suffer as a result of this unjust enrichment, including, but not limited to, damages in the form of outstanding royalty payments in excess of $4 million.

WHEREFORE, VMR prays for a judgment against Mitchell finding that it was unjustly enriched; for an award of damages in an amount not yet calculated but exceeding $75,000; for costs together with prejudgment and postjudgment interest and attorneys' fees; and for such other and further relief in favor of VMR as the Court deems just and proper.

## COUNT IV—ACCOUNTING

58. VMR realleges and incorporates herein by reference paragraphs 1 through 57.

59. The nature of the relationship between VMR and Mitchell requires Mitchell to account for royalties due. Based on the Agreement, Mitchell owed VMR a duty to account for and pay a royalty on all Eligible Revenue, each month, in accordance with its standard financial and accounts payable policies, until the maximum amount of $4.5 million in royalty payments is reached.

60. Because Mitchell had and continues to have exclusive control over the financial records bearing on the amount of Eligible Revenue as well as the number of transactions, and thus, the amount of royalties due, VMR has a right to an accounting.

61. The complexity of the transactions involved in calculating Eligible Revenue and royalties due further supports VMR's right to an accounting.

62. Mitchell has breached its duty to VMR by failing to pay to VMR the agreed-upon royalty and underpaying on royalties already disbursed to VMR, and, as a result, has caused damage to VMR.

63. Mitchell owes VMR outstanding royalty payments, and the amount of such damages may not be readily ascertainable. Thus, an accounting is necessary to fully and adequately determine the amounts due and owing to VMR as a result of Mitchell's misconduct.

WHEREFORE, VMR prays that the Court order an accounting at Mitchell's expense to adequately determine the damages resulting from Mitchell's misconduct; that Mitchell be required to account for its acts and conduct undertaken in connection with the marketing, sale or license of any total loss settlement system, including, but not limited to, the TLSS Product and WorkCenter™ Total Loss, from 2000 to the present; that VMR have judgment against Mitchell for any sums or balance found to be due VMR as a result of Mitchell's breach of the duties it owed to VMR; that VMR be awarded its costs in this action, prejudgment and postjudgment interest, and attorneys' fees; and for such other and further relief in favor of VMR as this Court deems just and proper.

## COUNT V—DECLARATORY JUDGMENT

64. VMR realleges and incorporates herein by reference paragraphs 1 through 63.

65. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), an actual case or controversy exists between VMR and Mitchell that is ripe for adjudication.

66. VMR and Mitchell have a real interest in the questions to be resolved.

67. The parties' rights, status, or other legal relations are affected by the Agreement, as amended.

68. The Agreement contains provisions concerning royalty payments from Mitchell to VMR in exchange for VMR creating and granting Mitchell an interest in the total loss settlement system. (Ex. A, Agreement, Schedule A, at 11).

69. A dispute exists concerning Mitchell's duty to pay VMR a royalty on revenue collected by Mitchell from the marketing, sale or license or on the use or number of transactions of total loss settlement system products

70. VMR seeks a declaration (a) that Mitchell has an obligation to pay VMR royalties based on the revenue Mitchell has generated from the marketing, sale or license, or based on the use at a rate of $1.00 per transaction, whichever is greater, of the total loss settlement system products or similar products it has marketed, sold or licensed to date; (b) that Mitchell has an obligation to pay VMR future royalties based on the revenue Mitchell generates from the marketing, sale or license, or based on the use at a rate of $1.00 per transaction, whichever is greater, of the total loss settlement system products or similar products it will continue to market, sell or license until the total payments to VMR equals $4.5 million; (c) that Mitchell has been and will continue to be unjustly enriched by receiving the full benefit of the total loss settlement system product produced by VMR without correspondingly paying all the royalties due to VMR for Mitchell's interest in said TLSS Product; and (d) that VMR is entitled to a full accounting at Mitchell's expense of, among other things, (i) all payments to VMR, (ii) all revenue generated to date and all future revenue generated from the marketing, sale or license of any total loss

settlement system product, and (iii) all transactions to date and future transactions of any such total loss settlement system product.

WHEREFORE, VMR prays for a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Mitchell has an obligation to pay VMR royalties based on revenue Mitchell has generated from the marketing, sale or license, or based the use at a rate of $1.00 per transaction, whichever is greater, of the total loss settlement system products or similar products it has marketed, sold or licensed to date; that Mitchell has an obligation to pay VMR future royalties based on the revenue Mitchell generates from the marketing, sale or license, or based on the use at a rate of $1.00 per transaction, whichever is greater, of the total loss settlement system products or similar products it will continue to market, sell or license, until the total of payments to VMR equals $4.5 million; that Mitchell has been and will continue to be unjustly enriched by receiving the full benefit of the total loss settlement system product produced by VMR without correspondingly paying all of the royalties due to VMR for Mitchell's interest in said TLSS Product; and that VMR is entitled to a full accounting at Mitchell's expense, including but not limited to, records (i) of all payments to VMR, (ii) of all revenue generated to date and all future revenue generated from the marketing, sale or license of any total loss settlement system, and (iii) of all transactions to date and future transactions of any such total loss settlement system; that VMR is entitled to an award of any further necessary or proper relief in favor based on the declaratory judgment pursuant to 28 U.S.C. § 2202; that VMR is entitled to an award of its costs, prejudgment and postjudgment interest, and attorneys' fees; and that VMR is entitled to such other and further relief as this Court deems just and proper.

## JURY DEMAND

VMR hereby demands a trial by jury in Kansas City for all issues for which a jury trial is proper.

Respectfully submitted,

STINSON MORRISON HECKER LLP

by: Matthew J. Salzman

Matthew J. Salzman, KS #19460
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Tel: (816) 842-8600
Fax: (816) 691-3495
E-mail: msalzman@stinson.com

ATTORNEYS FOR PLAINTIFF
VEHICLE MARKET RESEARCH, INC.