**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| VEHICLE MARKET RESEARCH, INC.,<br>Plaintiff,<br>v.<br>MITCHELL INTERNATIONAL, INC.,<br>Defendant. | Civil Action No. 2:09-cv-02518-JAR-GLR |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LARRY C. NILSON

## INTRODUCTION

VMR agreed to provide Mitchell exclusive rights to a "total loss" valuation concept and an eventual product for use in the automobile claims industry. The parties specifically agreed that VMR would retain all rights to the concepts and receive royalties on the Mitchell products which utilized those concepts. (ECF 86-3, Agreement at ¶8.1). As Dean Ricciardulli (the drafter of the Agreement on behalf of Mitchell) stated, "VMR retained the intellectual property rights, including, but not limited to, the concepts and, further, if Mitchell used the concepts, they would owe a royalty, whether it was the iNTOTAL product or a subsequent product." (ECF 86-7, Ricciardulli Dep. Tr. at 142:5-144:10). Mitchell employees admit the subsequent total loss product was made with and utilized the VMR concepts, yet Mitchell executives refuse to pay royalties.[1]

Mitchell has adduced the "expert" testimony of Larry Nilson in an attempt to establish that the concepts and other particulars of VMR's prototype and total loss product were not novel

[1] To avoid unnecessary duplication, only a brief factual summary is stated here. For additional factual background, please see the summary judgment briefs. (ECF 86, 93, and 98).

in 1998. Mitchell is presumably going to attempt to bootstrap that testimony into an argument that if what VMR sold to Mitchell via contract was not novel; Mitchell was entitled to breach the contract with impunity. However, black letter law provides that in a breach of contract action, novelty of the concept or product bargained for is irrelevant. Thus, the novelty of VMR's concepts, prototype, or total loss system is not at issue in this litigation, and Mr. Nilson's opinion is thus, by definition, irrelevant and inadmissible.

Further, Mr. Nilson has no expertise in the development of a total loss system or knowledge of its functionality. The only documents he reviewed were Pete Tagliapietra's deposition transcripts and some screen shots from the VMR prototype. His entire report consists of uncorroborated opinions on Pete's testimony regarding VMR's total loss concept and product, and whether the concept and product was novel.

What Mitchell did *not* provide Mr. Nilson speaks volumes. In conjunction with deciding whether to obtain a license to use VMR's total loss concepts and product, Mitchell hired Robert Douglas, a former Mitchell executive, to conduct a feasibility study. Mr. Douglas concluded that the concept constituted a "paradigm shift" in the total loss industry. (ECF 86-21, Douglas "Real Steel" Study at 6). It is disingenuous for Mitchell to undermine its own executive, Mr. Douglas, whose report was written contemporaneously with the study in 1996-98, with Mr. Nilson's memory of how things *might* have been when he performed adjustment services over 15 years ago.

## I. ***Daubert* Standard**

Federal Rule of Evidence 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999). The proponent of the expert testimony bears the burden of establishing its reliability. *United States v. Nacchio*, 555 F.3d 1234, 1245 (10th Cir. 2009).

In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony ... has 'a reliable basis in the knowledge and experience of his discipline.'" *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). This requires a preliminary inquiry into the expert's qualifications and "whether the reasoning or methodology underlying the testimony" is reliable under the standards set by Rule 702. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004). Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand." *Norris*, 397 F.3d at 884 (quoting *Daubert*, 509 U.S. at 597). Under Rule 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"Reliability questions may concern the expert's data, method, or his application of the method to the data." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). *Daubert* sets forth a non-exhaustive and non-dispositive list of four factors that the trial court may

consider: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community. *Daubert*, 509 U.S. at 593-94. In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a Court's gatekeeping inquiry into reliability must be "tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted). In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundation. *Id.* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)). The Court's review is focused "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

### *A. Reliability*

Mr. Nilson is not qualified to offer expert testimony on the history or business practices of the total loss valuation industry or how information was historically compiled and / or reported. He does not know what "state of the art" means and has never testified to the state of the art of processing insurance claims in his work as an expert witness on total loss claims.[2] (Ex. 1, Nilson Dep. Tr. at 14:20-15:11). He admitted that he was not even involved in the industry during the relevant period:

Q. All right. And then you left after that year and a half [in 1995]?

[2] Contrary to Rule 26(a)(2), Mr. Nilson failed to include with his report a list of all other cases in which, during the previous 4 years, the witness testified as expert at trial or by deposition. His report is subject to being stricken on that basis, as well. *American General Life & Acc. Ins. Co. v. Ward*, 530 F.Supp.2d 1306, 1311 (N.D. Ga. 2008). He testified that he acted as an expert 8-10 times per year for the last 4-5 years, but claimed he could not remember the names of parties, courts, or proceedings. (Ex. 1, Excerpts from Nilson Dep. Tr. at 13:13-25). He does, however, purport to testify with clarity about documents created and events occurring in 1998, relying solely upon memory.

A. Yes.

Q. And what did you do then?

A. I watched Barney with my kids.

* * *

Q. All right. So you didn't work for ADP as a consultant or employee between '95 and '98.

A. Probably.

Q. And you've never worked for CCC.

A. No.

Q. And you've never worked for Mitchell.

A. No.

Q. So between '95 and '98 what did you do?

A. Not a lot.

(Ex. 1, Nilson Dep. Tr. at 55:19-23, 57:2-10).

Mr. Nilson conducted *no* research to determine the state of the art prior to 1998 in preparation of his report. (Ex. 1, Nilson Dep. Tr. at 19:8-11). He looked at the depositions of Pete Tagliapietra and some screenshots from VMR's prototype (*id.* at 23:6-16), but did not review any reports or other historical documents in existence prior to 1998. (*Id.* at 23:18-25:8). Mr. Nilson is unable to testify with certainty what the total loss information providers relied upon in their calculations. (*Id.* at 51:16-52:23). He has no knowledge of how a total loss system works, but testifies only to his memory of what a report *may* have contained.

Moreover, Mitchell retained Robert Douglas as an expert during the time period in question. Mr. Douglas authored a contemporaneous report addressing the viability of Mitchell proceeding with VMR's concept and product in the development of its total loss services. (ECF 86-21, Douglas "Real Steel" Study). In conjunction therewith, Mr. Douglas conducted research

and offered his opinion on customer dissatisfaction with the leading providers of total loss evaluations, Mitchell's two primary competitors in this area, CCC and ADP. (*Id.* at 1). Mr. Douglas also goes into great detail on the new paradigm presented by VMR and delineates elements of the auditable data therein. (*See id.* at 6-12).

Mr. Nilson's testimony is speculative, at best, and thus will be of no assistance to the fact finder. His testimony bears all the hallmarks of unreliability and should be excluded. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (noting that an expert opinion must be based on facts which enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation.).

### *B. Relevance*

As noted above, Mitchell is attempting through Mr. Nilson to establish that VMR's total loss ideas, concepts, and prototype were not novel to the industry and therefore, Mitchell is entitled to use them at will, irrespective of the contractual arrangement and the implied covenant of good faith and fair dealing. [3] In other words, Mitchell claims that it was appropriate to create a new total loss product, utilizing VMR's concepts, prototype, and product without violating the spirit or letter of the contract. Mitchell may have been entitled to purchase a competing product from a non-party or built one from scratch; however, the unrefuted testimony is that the contract prohibited Mitchell from using VMR's concepts, prototype, screen shots, requirements, etc. in developing its successive product, and that Mitchell blatantly breached the contract.

California recognizes an implied covenant of good faith and fair dealing in every contract. "Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." *Freeman & Mills, Inc. v. Belcher Oil Co.*,

[3] While lack of novelty is a defense in a patent litigation (35 U.S.C. §§ 101 & 102), it has no bearing on a contract / licensing case.

900 P.2d 669, 672 (Cal. 1995) (citations omitted). Numerous courts (including California) have found that complying with "business ethics" is synonymous to meeting the obligation of good faith and fair dealing. When the breaching party has acted in bad faith, the party has "presumably committed acts offensive to 'accepted notions of business ethics.'" *Id.* (citation omitted); *see also Harris v. Atlantic Richfield Co.*, 14 Cal.App.4th 70, 81 (1993) (noting that bad faith goes beyond the mere breach of contract and offends accepted notions of business ethics.). In *66 VMD Associates, LLC v. Melick-Tully & Associates, P.C.*, 2011 WL 3503160, *3 (N.J. Super. A.D. Aug. 11, 2011) (noting that an inappropriate business ethic is synonymous with a "lack of good faith, honesty and fact, and . . . fair dealing.") (citation, internal quotation & ellipsis omitted).

Former Mitchell CEO Mr. Lindner expressly testified that business ethics prohibited Mitchell from using VMR's iNTOTAL product to create its new total loss product and, further, that he gave explicit instructions to *not* use VMR's product. Failure to abide by his instructions would admittedly require Mitchell to pay the agreed-upon royalties. Mr. Lindner himself identified the good faith and fair dealing standard applicable to the Agreement, when he specifically defined that Mitchell's ethical business obligation to VMR was:

> 1) to refrain from using the VMR work product in the development of TLV (Ex. 5, Lindner Dep. Tr. at 99:18-25), *or*
>
> 2) if, notwithstanding his directive, Mitchell *did* use iNTOTAL, a royalty would be owed. (*Id.* at 168:13-169:1).

(ECF 86-5, Lindner Dep. Tr.). Mr. Lindner was testifying as Mitchell's 30(b)(6) representative, and Mitchell is bound by the testimony.

As confirmed by the leading copyright commentator, Professor Nimmer, in applying the obligation of good faith and fair dealing to a license agreement, this negative covenant prevents a grantee from "creating a new work based upon the prior work, or based upon the same idea,

theme, or title, *even if a stranger could create a new work with such idea, theme or title, without infringing the grantor's copyright*." *SAS Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F.Supp. 816, 827-28 (M.D. Tenn. 1985) (emphasis added) (holding that duty not to circumvent license was violated when computer software company used another's proprietary materials). Professor Nimmer could have been describing Mitchell's breach in this matter—creating a new work based upon VMR's prior work, and then refusing to meet its royalty obligations under the contract. Although Mitchell had opportunity to respond to Professor Nimmer and the foregoing black letter law in summary judgment briefing, it failed to do so.

Because lack of novelty is no defense to Mitchell's breach, the novelty of VMR's concept or product will not be considered by the jury. Thus, Mr. Nilson's testimony is not relevant to the task at hand, and should be excluded.

**CONCLUSION**

Based upon the foregoing and in accordance with Rule 702, *Daubert* and its progeny, the expert testimony of Mr. Nilson should be excluded as it is both unreliable and irrelevant.

Dated this 15th day of March, 2012.

*/s/ Emmanuel N. Ayuk*
Attorney for Plaintiff Vehicle Market Research, Inc.

**CERTIFICATE OF SERVICE**

The undersigned Attorney hereby certifies that on this 15th day of March, 2012, a copy of the foregoing was filed with the Clerk using the CM/ECF System, which automatically transmitted a Notice of Electronic Filing to the following ECF registered counsel of record:

Scott T. Schutte, IL #6230227
Tedd M. Warden, IL #6297897
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601-5094
Tel: (312) 324-1000
Fax: (312) 324-1001
sschutte@morganlewis.com
twarden@morganlewis.com

Anthony J. Durone, KS # 17492
BERKOWITZ OLIVER WILLIAMS
SHAW & EISENBRANDT LLP
2600 Grand Blvd., Suite 1200
Kansas City, MO 64108
Tel: (816) 561-7007
Fax: (816) 561-1888
ADurone@bowse-law.com

*/s/ Emmanuel N. Ayuk*
Attorney for Plaintiff Vehicle Market Research, Inc.

DB04/835236.0002_0001/5858893.1DD02