Naegeli Reporting
"The Deposition Experts"
(800) 528-3335
NaegeliReporting.com
Serving all of Washington, Oregon, Idaho and the Nation
Selected "Best Court Reporting Firm"
Court Reporting | Videography | Copying and Scanning | Trial Presentation | Interpreters | Videoconferencing

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

VEHICLE MARKET RESEARCH, INC.,

Plaintiff,

vs. No. 2:09-cv-02518-JAR-GLR

MITCHELL INTERNATIONAL, INC.,

Defendant.

______________________________________



**DEPOSITION OF LARRY C. NILSON**
**Taken on behalf of the Plaintiff**
**Wednesday, February 1, 2012**

EXHIBIT
1

APPEARANCES

Appearing on behalf of the Plaintiff,
Vehicle Market Research, Inc.:
MARK J. PETERSON
Stinson Morrison Heckler LLP
1299 Farnam Street, Suite 1500
Omaha, Nebraska 68102
(402) 342-1700
(402) 930-1701 Fax

Appearing on behalf of the Defendant,
Mitchell International, Inc.:
SCOTT T. SCHUTTE
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, Illinois 60601
(312) 324-1773
(312) 324-1001 Fax



INDEX

| | Page |
|---|---|
| EXAMINATION BY MR. PETERSON | 6 |
| EXAMINATION BY MR. SCHUTTE | 103 |
| EXAMINATION BY MR. PETERSON | 105 |



EXHIBITS

| Exhibit | | Page |
|---|---|---|
| 1 | EXPERT REPORT OF LARRY C. NILSON | 21 |
| 2 | VEHICLE MARKET RESEARCH VALUATION | 74 |
| 3 | VEHICLE VALUATION REPORT | 85 |
| 4 | CLAIM SUMMARY AND OTHER DOCUMENTS | 89 |
| 5 | AUTOSOURCE VALUATION - 1994 NISSAN SENTRA SE 2D SEDAN | 93 |



DEPOSITION OF LARRY C. NILSON
Taken on behalf of the Plaintiff
Wednesday, February 1, 2012

BE IT REMEMBERED THAT pursuant to the Oregon ruses of Civil Procedure, the deposition of LARRY NILSON, was taken before Jesse Brown, Notary Public, on Wednesday, February 1, 2012, commencing at the hour of 9:42 a.m., the proceedings being reported at 111 S.W. 5th Avenue, Suite 2020, Portland, OR.

DEPOSITION OF LARRY C. NILSON
WEDNESDAY, FEBRUARY 1, 2012
9:43 A.M.

LARRY C. NILSON, Having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. PETERSON:
Q. Good morning. Could you state your full name for the record?
A. Larry Claude Nilson.
Q. And your office address, sir?
A. What's that?
Q. Your office address.
A. My office address? Office address is going to be 15144 South Victory Road, Oregon City, 97045.
Q. And do you live here in the Portland area?
A. Yes.
Q. You've had your deposition taken before I take it?
A. Yes.
Q. Okay. And have you acted as an expert witness in any case before?



A. Yes.
Q. Approximately how many?
A. Probably eight a year, ten a year.
Q. For how many years?
A. Oh, probably for the last four or five years.
Q. So if my math is correct maybe up to 40 times you've been retained as an expert?
A. Probably.
Q. Okay. Have you testified in each of those instances?
A. Sometimes they settle before we get there so I wouldn't testify.
Q. Okay. Are depositions taken in most of those cases?
A. No, no. They're arbitrators. They're arbitrations mainly.
Q. How many times have you had your deposition taken before then?
A. Probably two or three.
Q. Generally can you describe the type of expert witness testimony you've provided in these approximately 40 times?
A. Two -- two things mainly. One would be the value of a vehicle. And the other one would be



the diminished value of the vehicle.
Q. Why don't you first of all explain generally what you mean by testifying about the value of a vehicle?
A. From time to time -- it's in the insurance company's policy that if you as a -- if you buy insurance from a company and your car is wrecked and they offer you a dollar amount to settle, if you're not pleased with that amount then you have an opportunity to hire your own appraiser. And then the insurance company hires their own appraiser and those two appraisers try to come up with a value. And if they can't they hire a third. Now, if it's a claimant situation then the claimant is compelled to sue. So when there's a dispute that's beyond the two appraisers or that system then there has to be an arbitration.
Q. And that's when you -- what you mean by sue it would go to an arbitration.
A. Yes. And there would be an attorney that is the arbitrator rather than a judge.
Q. And I take it the 40 times that you've acted as an expert at least in the situations of determining the value of a vehicle you would have been either retained by the insurance company or the



insured?
A. That's correct.
Q. And what's the percentage of how many times you've represented the insurance company versus the individual?
A. I would guess 80, 80 for insurance companies and 20 for private parties.
Q. And would these disputes involve, when you're dealing with a value of the vehicle, involve both partial loss as well as total loss on the vehicle?
A. Just total loss.
Q. Okay. And how many of the 40 times you've acted as an expert in those situations have been involved with determining the value of the vehicle?
MR. SCHUTTE: Object to form. Go ahead if you understand.
Q. Well, let me try to clean it up a little bit. I'm not sure it's a very good question. You've indicated approximately 40 times you've acted as an expert and it's been one of two situations, either value of the vehicle or the diminished value of the vehicle.
A. That's right.
Q. All right. And what I'm asking is of

10

those 40 how many dealt with the value of the vehicle as opposed to the diminished value?
A. Oh, probably a quarter or less. Most of them are diminished value because it's a claimant situation.
Q. All right. And before we get there tell me what is testimony in regards to diminished value.
A. This is something that is probably relatively new in the legal world and this is a concept where if you're happy, driving your vehicle down the road, and somebody runs into you and the car is repaired there's some people that say that that repaired vehicle now has a stigma and so its value is less. And so because there's no documentation as to whether this is even true or not then each of these issues usually end up in some sort of financial squabble.
Q. Okay. And again it would be a -- well, first of all, would each of these diminished value disputes in which you acted as an expert involve a partial loss on the vehicle?
A. Well, I don't understand what you mean by a partial loss.
Q. Well, I mean when you testified -- when you have testified in cases that are dealing with

11

the diminished value of a vehicle I take it in those situations the insured continues to drive the vehicle.
A. Yes. Oh, absolutely. It's repaired. It's a repaired vehicle.
Q. Okay.
A. It's usually a rear-ender and they replace a quarter panel and they have to pull on it. So what we did early on when this became an issue we established industry standards that existed and then we follow those standards. But other appraisers just pull a number willy-nilly out of the air. And so then they have to be brought back into reality.
Q. And 80 percent approximately of your testimony as an expert has been in regards to this diminished value as opposed to the value of the vehicle.
A. Yes.
Q. All right. One thing you're going to need to do, I speak a little slowly. So please let me finish my question and then you answer so that it's a little bit cleaner on the record if you will.
A. Okay.
Q. All right. Would the matters involving diminished value of vehicles, are those also through

12

an arbitration process?
A. Sometimes.
Q. Are some -- are they sometimes in court proceedings?
A. Yes.
Q. And how many times have you testified in court as to diminished value?
A. I think I said that. About 80 percent of those ones we did.
Q. All right. Let me make sure. I may just not be understanding it. I understood your testimony is that 80 percent of the 40 would be involved in diminished value. And then you said there are some diminished value cases that are arbitrated and some that actually go to court.
A. Yes. Probably -- okay, I can just say this then. Of the ones that go to court probably ten percent.
Q. Have all of your matters in which you have acted as an expert, whether they're determining the value of the vehicle or diminished value of the vehicle, have they all been here in the state of Oregon?
A. And Washington generally but I've been to Colorado and...

13

Q. Have you ever testified in federal court?
A. No, I don't think so.
Q. The courts that you have testified in, have they been here in Oregon?
A. Mostly. Either here or in Washington generally.
Q. Okay. Is that here in the Portland area?
A. Between Portland and Salem, Seattle.
Q. Do you know the names of the courts that you've testified in?
A. No.
Q. Do you know the names of the courts or counties that you've testified to in the state of Washington?
A. I would have to guess. Yeah, I don't know offhand the counties up there.
Q. Has that been in the last couple of years, the testimony that you've given either in Oregon or Washington in the court system?
A. Yes.
Q. But you don't have a list of those?
A. No, I don't keep track of them.
Q. And you can't -- and you can't remember what courts you were in.
A. No, I don't know the difference myself.

14

I'm not into the legal business.
Q. Do you know what county you were in?
A. Not really.
Q. Do you know what city you were in?
A. Seattle.
Q. How about in Oregon?
A. Portland, Salem. Maybe -- I went once to down by Albany.
Q. And these are situations that happened in the last couple of years?
A. Yeah. Probably in the last four, four or five years.
Q. In cases in which you testified in court did you represent or testify on behalf of the insurance company or the individual?
A. It's a mixed bag.
Q. And what was that mix?
A. Probably 80, 90 percent for insurance companies, 10 for private parties.
Q. Have you ever testified as an expert regarding the state of the art of the insurance industry at a specific point in time?
A. I don't think so. I don't quite understand the question either.
Q. Okay. What is it that you don't

15

understand? Do you understand the term "state of the art"?
A. No. What do you mean by that?
Q. Well, for purposes of this deposition let's -- let's assume the state of the art is what procedures, processes or things, if you will, were done in the industry prior to a specific point in time.
A. Oh, okay. I've never done that. My business partner did it and I was aware that he did it.
Q. Do you know the situation in which he was involved?
A. It was a -- it was in Washington, D.C. and it was with ADP versus somebody and I don't know the particulars on that.
Q. And they were looking as to what--
A. I don't know what they were looking at.
Q. Okay.
A. It was probably in 1998 or something.
Q. But you have never provided any testimony regarding the state of the art in the insurance business before.
A. Not in a courtroom.
Q. Have you ever done any -- have you ever

16

done any work at all in trying to determine what the state of art was in the insurance industry for a particular time before?
A. No. Not that I can think of.
Q. What was your understanding of your assignment in this case?
A. I was asked to review some documents that they supplied me and comment on them.
Q. Okay. Did you see your task as trying to determine what the state of the art was in the insurance industry as of a specific time?
A. The way I understand it my job was here to review what was stated and then respond to it.
Q. Okay. And I'm not trying to be difficult. I'm just trying to understand clearly what you understood your task to be and then, you know, what your responses were. All right. And so I take it from your answers you received certain documents, commented upon those, and that's how you fulfilled your obligations. Is that right?
A. Yes.
Q. All right. And you weren't specifically asked to go out and look and determine what the state of the art was in the collision industry of insurance as of a specific date.

17

A. No, because I was just close to it. It was around me. I was involved in the middle of it. We -- as a company we made industry changes early on so we made -- the way total losses are done today, we made the change in the eighties.
Q. I guess what I'm asking so that I know what you're going to testify to at time of trial is do you expect to give a -- give testimony that the state of the art was a certain way prior to 1998?
MR. SCHUTTE: Object to form. Go ahead, Larry.
A. Okay. All I can tell -- say is relative to the company that I owned what we were doing at the time. I don't know -- I can't -- I wasn't -- I wasn't -- I didn't work for CCC nor did I work for Mitchell and they were the people doing it. In the early days I didn't work for ADP. So they were the players in the whole business and we were one of them. And we made the changes in the industry.
Q. And I'm not trying to be -- I'm just trying to understand what your testimony is going to be at trial. I mean, and we've got -- I've got your report and there are six or seven items that you've commented on.
A. That's right.

18

Q. Fair? All right. And we'll talk about that in a bit. But what I'm trying to understand is if you are going to give any additional testimony such as this is what I believe the state of the art was prior to a specific date.
A. Perhaps on some things I can say that.
Q. But you haven't written those opinions in this report, have you?
A. No, because I wasn't asked.
Q. Okay. Make sure I -- but you think you could give such an opinion but you haven't been asked to do so. Is that right?
A. I think I could do it on some things.
Q. But is that your testimony, you haven't been asked to do it so you didn't put it in the report?
A. Right.
Q. So unless you're asked you don't expect to give an opinion at time of trial that the state of the art in the insurance industry prior to March of '98 was a certain way?
MR. SCHUTTE: Asked and answered. Object to form. Go ahead.
A. If I'm asked I can certainly give my opinion on what it was like. And I can talk about

19

the changes that we introduced into the industry from 1983 on.
Q. I think I have asked this but that's not part of your report.
A. No. Well, it's kind of indirectly because sometimes some of the issues, I'm saying that we were doing that particular item already.
Q. Did you do any research to determine the state of the art prior to '98 in preparation of your report?
A. No.
Q. And what I mean by research did you go look at any reports or treatises or books or anything?
A. No. I called -- okay. No, I did not do that. I did call a few people I knew that worked with us in the industry and clarified some dates because it had been a few years.
Q. Is any of that research outlined in this report?
A. No. I mean, I think I was right on. I just -- they just reiterated what I already knew.
Q. And who did you contact?
A. I contacted Matt Train.
Q. Who's he?

20

A. He works for ADP. Or he works for AutoSource.
Q. He still works for AutoSource?
A. Yes.
Q. And what -- did he provide you any information?
A. Yes.
Q. Did he provide you any reports?
A. No.
Q. Any documents?
A. No.
Q. Any corroborating evidence as to dates as to when certain things were done or not done?
A. We had a question as to there's an issue on the zip code business and he clarified that.
Q. But that was a discussion between you and him?
A. Yeah.
Q. But there weren't any documents exchanged to verify dates?
A. No.
Q. Is that a "no"?
A. No.
Q. Okay.
A. That is correct, that's a no.

21

Q. Thank you.
(Whereupon the Expert Report was marked Exhibit 1 for identification.)
Q. Handing you what's been marked as Exhibit No. 1. Can you identify that for me?
A. This is a report -- I guess it's a report that I did when requested.
Q. That Mitchell requested you perform?
A. Yes.
Q. Did you ever talk to anybody at Mitchell about this report?
A. Not about the report. Somebody from Mitchell called me.
Q. And who was that?
A. I don't know. It was an attorney.
Q. Oh, it was counsel?
A. Their counsel.
Q. Mr. Gray? You don't know?
A. He said that some other attorneys would call me.
Q. And then Mr. Schutte or someone from his office called.
A. They called.
Q. And that's the only correspondence that you've had with Mitchell?

A. Yes.
Q. All right. Why don't we turn to the second page in follow-up to one of your answers. There's -- towards the bottom of page 2 there is three bullet points there. Do you see that?
A. Um-hmm.
Q. All right. And before we get to those did anyone help you prepare this report?
A. Yes.
Q. And who is that?
A. Mr. Schutte.
Q. Mr. Schutte?
A. Yeah. Actually I'm going to rephrase that. Bill Briggs and myself went over this stuff and then he was also involved.
Q. He being Mr. Schutte?
A. Yes.
Q. Who actually did the work in typing this up?
A. I don't know who did it. I didn't.
Q. You didn't?
A. No.
Q. Did Mr. Briggs?
A. No.
Q. Okay. I take it you got this report,



reviewed it, signed it, approved of it. Is that right? You'll need to say yes or no.
A. Oh, I'm sorry. Yes. I understand.
Q. Sometimes we have videos. We don't today so you'll need to say yes or no. All right.
Okay. There are three bullet points then at the bottom of page 2. Are these the documents that you reviewed in preparation of signing the report?
A. Yes.
Q. All right. Were there any other documents that you reviewed?
A. No. I don't remember. I don't think so. There were just the two depositions and then the pictures of the screen.
Q. What we refer to as screenshots?
A. Yes.
Q. All right. Did you have an opportunity to look at the operating prototype of VMR's?
A. No.
Q. Did you look at any reports of ADP in preparation of this report?
A. Not any.
Q. Did you look at any reports of CCC in preparation of this report?



A. Not in preparation of the report. I look at them. I can clarify that though. I look at CCC reports regularly.
Q. All right. Have you looked at--
A. And ADP reports.
Q. All right. And let's clarify that. I take it in your business you'd seen CCC reports or ADP reports.
A. Yes.
Q. And we'll talk about your history in just a second. But did you look at any CCC reports that were created prior to 1998 in preparation of your report?
A. No.
Q. Did you look at any reports from ADP that were created prior to 1998 in preparation of your report?
A. No.
Q. Did you look at any Mitchell reports in preparation of your report?
A. No.
Q. And when I say "Mitchell" did you look specifically at any report that utilizes the system that they call The Workplace or TOV?
A. No.



Q. Did you look at any report from Mitchell that utilized what they call the In Total system?
A. No. Not for this report. And not for this particular deal. I've seen some of those reports.
Q. But you didn't go back and look to see the dates and what was present in them.
A. No.
MR. SCHUTTE: Can you make sure you speak up? I want to make sure that the court reporter can hear.
Q. Did you look at any internal documents of Mitchell such as marketing material regarding the In Total product?
A. No.
Q. Did you look at any other internal documentation of Mitchell in preparation of this report?
A. No.
Q. Did you look at a report of a Mr. Robert Douglas in preparation of this report?
A. I remember reviewing the name. I don't think I looked at his report.
Q. Did you look at a report from a Mr. Hetz?
A. No. I think he's referred to in the

MR. SCHUTTE: Object to form. It's also outside the scope of this expert report but go ahead.
A. Well, I would -- personally I wouldn't trust a VIN. You run the VIN on a CARFAX you get a VIN history of that vehicle. But you get a real weak amount of data as to what the options were.
Q. I'm not talking about CARFAX. I'm talking about a company that provides the information--
A. They are a company that provides the information on what the car was, the history of it as well as they decode the VIN.
Q. So you -- you're saying that you would find the person that's trying to sell their vehicle to be more trustworthy than the VIN number that's used to obtain the options from a third party that's getting that information from the manufacturer.
A. You're asking for something I don't think exists. I don't think you can get the options, the options, tilt, cruise, air, steering, brakes. You won't get that off a VIN. You won't -- you might get the trim level or the model. Like a Honda is real common, EX, LX, DX. You'll get that statement from the manufacturer as to which one it is. And then you can go back to other publications and put



it together into a format that will say it has tilt, cruise, air, et cetera, et cetera. You can do it as secondary but the VIN itself will not tell you that.
Q. So from -- your belief is the VIN has no value.
A. It has value but it isn't -- it isn't the end-all.
Q. And you didn't use the VIN at NADS.
MR. SCHUTTE: Object. That misleads his testimony. Go ahead.
A. We decoded VINs at NADS. After we found that we could buy it outright we bought a decoder. And at the time when the AutoSource program was created it had the VIN decoding portion of it on the report.
Q. Yeah, understood. All right. But CCC, do you know whether they used a VIN for each comparable vehicle prior to '98 in the total-loss situation in their report?
A. I'm sure they did.
Q. Do you know that or not?
A. Well, yeah, because they were selling this VIN decoding product.
Q. So your testimony is that prior to '98 CCC on each and every situation used a VIN number--



A. I can't answer that question because I didn't work for CCC.
Q. Okay. That's my question. You don't know whether they used it in '98 or not.
A. Right.
Q. And you don't know if they used the VIN for comparable vehicles prior to '98.
A. Well, when we competed against them that was one of their things. VIN Guard was a big competing issue.
Q. I understand that that's what they said they used. Did you ever see reports of CCC?
A. Yes.
Q. Okay. Can you testify, you know, under oath with veracity that prior to '98 that CCC used the VIN on each and every comparable vehicle when determining a total loss?
A. No, because I didn't work there. That would be in-house knowledge.
Q. And you didn't do any investigation in preparation of this report to make that determination.
A. That's right.
MR. SCHUTTE: Can we take a break?
MR. PETERSON: Yeah, I'm good with it.



(Whereupon the proceedings were recessed.)
Q. Not exactly sure where we left off but I know where I was starting to go which was a little of your background so let's go back there. You sold NADS to ADP some time in '92 as I understand it.
A. Yes.
Q. All right. And then you were employed with ADP through it looks like about '93. Is that right?
A. Yes.
Q. All right. And what -- first of all what position did you hold at ADP?
A. I was a vice president.
Q. Okay. And was your employment for that year part of the transaction if you will in selling NADS?
A. Yes.
Q. And then I take it that agreement if we looked at the purchase of NADS by ADP said something to the effect of you would be employed for a period of a year at a certain salary.
A. Well, about a year and a half.
Q. Okay. And then once that year and a half expired then you left ADP.
A. Yes.

Q. And did you go into ADP on a daily basis then during that year and a half?
A. Yes.
Q. And what did you do for them?
A. Well, there was -- I dealt with the data, trying to get it cleaned up.
Q. When you say "data" is that the information that's obtained from the classified ads?
A. Yes. And from -- ADP within a month of the purchase closed our data entry system down and felt that their system could do it. They were in Ann Arbor, Michigan.
Q. All right. And was ADP doing the same thing that you were, that is taking information from the classified ads of the papers where they did business?
A. Yes.
Q. Were they obtaining information from any other source that they would then put into the database?
A. They had -- from their dealer arm they were picking up dealer information from what was on the dealers' lots. They were -- they were on the--
Q. So these would be individuals that were employed by ADP that would go to the various lots



and look and see what vehicles were there?
A. No, that was two things.
Q. Okay.
A. That was the second thing. I was in charge of that. And we walked lots to inspect the vehicles and then obviously a VIN was -- those all had VINs, all the cars we inspected at that time. We would hire people to walk the lot and collect the information.
Q. And what did you guys do with the VINs then?
A. It was tied to the car.
Q. Did you do anything with it such as obtain the information using the VIN from another source?
A. I don't -- I don't know. Not that I know of. They could have used it in the Audatex side.
Q. You just don't know.
A. I don't know.
Q. All right. And then you left after that year and a half?
A. Yes.
Q. And what did you do then?
A. I watched Barney with my kids.
Q. That's painful. How long did you do that?
A. Well, probably for six months and then I



went back to ADP as a consultant.
Q. And as a consultant how was it? Tell me about that arrangement.
A. They had two big customers, Allstate and State Farm of Arizona and Allstate in Los Angeles. And they were about ready to lose them because of the report issues. In other words the program was working and it worked well for most cars but there were some problem issues in it.
Q. Was this on total loss?
A. Yes.
Q. Okay.
A. And so I worked with both those offices and we were able to determine where the problems were in the program and we got it sorted out.
Q. How long did that take?
A. I was probably there for quite awhile actually. Over a year.
Q. So that takes us to approximately '95 or so?
A. Yeah.
Q. Okay. And then once that was resolved with Allstate and State Farm of Arizona and I think you said California was that the end of your consulting with ADP?



A. Yes.
Q. All right. So you didn't work for ADP as a consultant or employee between '95 and '98.
A. Probably.
Q. And you've never worked for CCC.
A. No.
Q. And you've never worked for Mitchell.
A. No.
Q. So between '95 and '98 what did you do?
A. Not a lot.
Q. Okay.
A. I did some appraisal work for an attorney firm in Vancouver, Washington. They specialized in bankruptcy so they needed vehicles appraised regularly.
Q. And I mean was that a full-time basis?
A. No.
Q. How many hours a week did you work?
A. Probably two or three a month.
Q. Two or three hours a month?
A. No. Valuations.
Q. Two or three valuations?
A. Yeah.
Q. Okay. And how long would a valuation take you?