## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **VEHICLE MARKET RESEARCH, INC.,** )<br>  )<br>  **Plaintiff,** )<br>  )<br>  **vs.** )<br>  )<br>  **MITCHELL INTERNATIONAL, INC.,** )<br>  )<br>  **Defendant.** )<br> _____ ) | **Case No. 09-2518-JAR** |

## MEMORANDUM AND ORDER

This is a dispute between Plaintiff Vehicle Market Research, Inc. ("VMR") and

Defendant Mitchell International, Inc. ("Mitchell") over whether Mitchell owes VMR royalties

under a software development contract.  VMR brings claims against Mitchell for breach of

contract and breach of the covenant of good faith and fair dealing under California law;

Defendant denies that it breached the contract and violated the implied covenant of good faith

and fair dealing and seeks a declaratory judgment.  Mitchell further argues that Plaintiff should

be judicially estopped from recovering in this case because VMR's sole shareholder, John

Tagliapietra, failed to disclose the potential value of his VMR stock during the course of his

personal bankruptcy proceedings based on the unpaid royalties that form of the basis of VMR's

damages in this case.  Before the Court are fully briefed cross-motions for summary judgment

(Docs. 83, 85).  The Court conducted a hearing on these motions on May 24, 2012.  The Court

has considered the evidence presented with the briefs and adduced at the hearing.  As described

more fully below, the Court grants Defendant's motion for summary judgment on the basis of

judicial estoppel.  Plaintiff's motion is denied.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[6] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[7]

---

[1]Fed. R. Civ. P. 56(a).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[7]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

II.    **Factual Background**

The following material facts are either uncontroverted, stipulated to in the Pretrial Order, or viewed in the light most favorable to the nonmoving party.[8]

Mitchell provides information, workflow, and performance management solutions to improve business processes for insurance companies and collision repair facilities.  At one time, it claimed to serve over 30,000 collision repair facilities, independent adjusters, and other repair chain participants and 250 insurance companies, including many of the nation's top carriers.

A total loss product is a product that assists automobile insurers in providing a fair market value for a vehicle that has been declared a total loss, i.e. a vehicle that will cost more to repair than its value at the time of the accident.  In 1996, while an employee at Mitchell, John "Pete" Tagliapietra proposed a total loss system for the company that would be based on Auto Trader publications.  Mitchell declined to use Tagliapietra's total loss concept but informed him that he was free to "pursue an Internet solution utilizing Auto Trader information on a regional basis so long as it does not interfere with your operational duties at Mitchell."[9]  Mitchell explicitly permitted Tagliapietra to be a passive owner or director of an organization that may be formed to pursue that opportunity, with certain restrictions.  Tagliapietra agreed in principle to providing Mitchell with the right of first refusal to sell the total loss concept directly to insurance companies under license or as an independent sales representative.

VMR, a Kansas corporation incorporated by Tagliapietra in 1997, developed its Total Loss Settlement System ("TLSS") prototype and presented it to Mitchell.  On March 20, 1998,

---

[8]Because the Court's decision rests on Defendant's judicial estoppel affirmative defense, raised only in Defendant's motion for summary judgment, it views the facts in the light most favorable to Plaintiff.

[9]Doc. 92, Ex. 8.

VMR and Mitchell executed a Computer Programming and System Integration Services Agreement (the "Agreement").  The Agreement was signed by Paul Rose, Executive Vice President and CFO of Mitchell, James Lindner, President and CEO of Mitchell, and David T. Duensing, M.D., President of VMR.  Lindner testified in his deposition that he does not recall who at Mitchell helped negotiate and draft the Agreement but believes one of the corporate attorneys would have drafted it.  Dean Riccardulli, who was in senior management at Mitchell at the time, testified that he was responsible for crafting the Agreement, although Lindner does not believe that he was a "creator" of the document.

The following are key provisions of the Agreement.[10]

Paragraph 1 of the Agreement provides for the scope of work to be performed:

> VMR agrees to perform for, and to provide to MITCHELL, and MITCHELL agrees to purchase from VMR and pay VMR for, Professional Services as described in Schedule A . . . required by MITCHELL in the design, development, production, installation, services, maintenance, and agreed upon enhancements of the MITCHELL Total Loss Settlement System (TLSS).

The Schedule A Overview provides: "VMR in conjunction with DAIS Incorporated ("Dais") acting as a MITCHELL approved independent contractor agrees to design, develop, maintain and support the Total Loss Settlement System (TLSS Product) based upon the VMR prototype system and MITCHELL/VMR product specifications."

Paragraphs 6.0, 6.1, 8.0 and 8.1 deal with ownership and use restrictions.  Paragraph 8.1 provides:

### 8.1 Ownership of Materials and Intellectual Property:

---

[10]Doc. 3, Ex. 1.

During the term of this Agreement and upon completion of all payments due, termination, cancellation, or expiration of this Agreement, but subject to the provisions of Paragraph 28 hereof, VMR shall immediately turn over all items (including the TLSS Product, Work Product or work in process) in its possession which were prepared pursuant to this Agreement or made available to VMR . . . used in developing the TLSS Product and Work Product and all rights, title, and interest or other materials furnished to VMR by MITCHELL during the course of VMR performing Professional Services, and all copies thereof. . . .

Notwithstanding the foregoing, VMR retains all right, title and interest in, and to any pre-existing software tools, utilities, concepts, techniques, text, research or development methods that VMR used in or applied to the development of the TLSS Product (the "Pre-Existing Materials").

VMR hereby grants MITCHELL an exclusive right and license to modify, adapt, reproduce, use and distribute the Pre-existing Materials as part of the TLSS-Product and as part of any adaptations, updates, enhancements or other derivative works based thereon.

The Exit Clause in Paragraph 29 of the Agreement provides that "Where MITCHELL terminates this Agreement as provided in this Paragraph, MITCHELL shall relinquish its ownership interest in the Work Product (but not Confidential Information), if any, to the date of termination, and VMR may freely use the Work Product (but not the Confidential Information) in the operation of its business." The parties agree that the contract was never terminated.

Schedule A provides for payment by Mitchell to VMR under the Agreement, including a royalty on "Eligible Revenue until a maximum cumulative total of $3,500,000 is paid out based upon the following royalty rate." "Eligible Revenue" is defined in Schedule A, which further provides that "[i]n no event will the transaction royalty paid to VMR be less than $1.00 per transaction. MITCHELL shall make all royalty payments hereunder on a monthly basis in accordance with its standard financial and accounts payable policies." In 2002, the parties executed an Amendment to the Agreement, increasing the maximum cumulative royalty payment

to $4,500,000.

VMR developed TLSS into a prototype and a total loss product, which were both delivered to Mitchell.  In 1999 or 2000, the completed TLSS product was released and marketed under the trade name iNTOTAL.  Tagliapietra resigned from his senior executive position at Mitchell in March 2000.

Mitchell paid VMR royalties based on revenue obtained from the use of the iNTOTAL product until September 2005, at the latest.  VMR received monthly royalties during this time, ranging in amount from $200 to $3300.  Sometime in September 2005, Tagliapietra spoke to Mitchell's in-house counsel Jason Gray on the phone and asked him to look into why the royalty payments had stopped.  Gray told him that he would look into it.

Mitchell began developing a total loss product in 2003 and Mitchell released the product to the market under the name Total Loss Valuation ("TLV").  According to a Mitchell press release, the TLV product was officially released at the 2005 NACE conference on November 2, 2005.[11]  Mitchell subsequently changed the name of TLV to WorkCenter Total Loss™ (hereinafter "TLV").

In December 2005, Tagliapietra bumped into Gray at a San Diego Costco store and referenced their September phone conversation—Gray had not followed up with him. Tagliapietra again asked why Mitchell had stopped paying VMR royalties.  Gray told Tagliapietra that Mitchell "had paid enough."  Tagliapietra told Mitchell's in-house counsel that he would pursue the issue of unpaid royalties "somehow."  Dayle Phillips, who was also a

---

[11]Mitchell submitted deposition testimony from Steve Mourton, a product manager at Mitchell, who testified that TLV was released to the public in "Octoberish" of 2005.  Construing the facts in the light most favorable to the nonmoving party, the press release on Mitchell letterhead makes clear that the official release occurred at the November 2, 2005 NACE conference.

former Mitchell employee, told Tagliapietra that he had spoken to Mitchell employees at the

NACE conference and they represented that the new TLV product was being built from the

ground up—this was the first time Tagliapietra learned about Mitchell's TLV product.

Tagliapietra looked into the TLV product.  He discovered that the Mitchell website no long

included information about iNTOTAL.  And he reached out to a contact at Mitchell who

confirmed that iNTOTAL was no longer used by Mitchell.

On October 14, 2005, Tagliapietra filed a pro se petition for Chapter 7 bankruptcy in the

United States Bankruptcy Court for the Southern District of California, Case No. 05-13698-

LT7.[12]  In the initial schedule, Tagliapietra disclosed his ownership in 1000 shares of VMR stock

and valued the stock at "0.00."  He amended his schedules with the assistance of counsel on

January 9, 2006, but did not change the stock valuation.  He did not list as an asset that VMR

had a potential cause of action against Mitchell for unpaid royalties.

Four creditors meetings took place during the bankruptcy case on December 9, 2005;

January 13, 2006; March 20, 2006; and April 3, 2006.  Tagliapietra never disclosed to the

Trustee at these meetings that the value of his VMR stock could be anything other than 0.00, or

that VMR had a potential breach of contract claim against Mitchell.  At the April 3, 2006

meeting, Tagliapietra addressed the Trustee's request for documents concerning a loan made to

VMR from proceeds of Tagliapietra's home refinance.  Tagliapietra, through his bankruptcy

attorney, represented that approximately $101,000 in proceeds were paid to "the borrowers" and

transferred into VMR accounts.  He advised the Trustee that "the moneys in the corporation's

account were used for the operation of the business."  Tagliapietra stated that the money was

---

[12]Defendant has submitted several documents filed in the bankruptcy case.  The Court also takes judicial notice of the docket sheet and the order of discharge (Doc. 116).

"documented as a loan" and was "used to pay utilities, interest payments on other loans." Tagliapietra was asked if the business was still ongoing and whether it could repay the loan; he replied that it was ongoing but "cannot" repay the loan.

Sometime midyear 2007, Tagliapietra began to suspect that Mitchell's TLV product violated the parties' Agreement based on a resemblance to iNTOTAL. He saw an interface at a client site and looked at the press releases on Mitchell's website, which contained more information than when he had checked in December 2005.

The discharge was entered on April 23, 2009 and the Trustee's final account and certification that the estate had been fully administered was filed on October 15, 2009. In this report, the Trustee valued Tagliapietra's profit sharing in VMR and two other companies as "unknown." On October 20, 2009, the bankruptcy court entered its order approving the account, discharging the Trustee, and closing the estate.

The sole purpose of VMR is to receive royalties under this Agreement. VMR has never had any business since incorporation other than being a party to the Agreement and the royalties are its sole source of income. VMR has never owned any real property or physical assets. Tagliapietra is personally funding VMR's prosecution of this case; VMR closed its only checking account in 2005 or 2006. Tagliapietra views himself as "one in the same" as VMR and is the 100 percent owner of VMR stock. According to Tagliapietra, VMR held informal board meetings "probably on a quarterly basis." VMR took board meeting notes only for the original meeting and there is no record of any other meetings with the VMR Board of Directors. Tagliapietra filed all documents on behalf of VMR with the State of Kansas and after 2002, he personally paid all filing fees with the State of Kansas on behalf of VMR.

In July 2009, Tagliapietra viewed the TLV product at a client site and became convinced that Mitchell had not built the product from scratch, but instead, had enhanced the iNTOTAL product.  The Complaint in this case was filed on October 5, 2009.

## III.   Discussion

Mitchell asserts a judicial estoppel affirmative defense, arguing that VMR's sole shareholder and alter ego, Tagliapietra, has taken inconsistent positions in his Chapter 7 bankruptcy case and in this case as to the value of VMR.  Mitchell argues that the doctrine should be applied under two theories: (1) Tagliapietra failed to disclose his potential breach of contract claim in this case to the Trustee; and (2) Tagliapietra failed to disclose to the Trustee the appropriate value of his VMR stock on his bankruptcy schedules.  Judicial estoppel is an equitable doctrine, which protects "'the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"[13]  As an equitable doctrine, the Court must consider all of the equities of the case.[14]  As a result, the circumstances under which a court might invoke judicial estoppel will vary.[15]  But typically, three factors "inform the decision whether to apply the doctrine in a particular case."[16]  First, a party's later position must be clearly inconsistent with its previous position.[17]  Second, a court should determine whether the party "succeeded in persuading a court to accept that party's former position, 'so that judicial acceptance of an inconsistent position in a later proceeding

---

[13]*Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007).

[14]*See New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001).

[15]*Id.*

[16]*Eastman*, 493 F.3d at 1156.

[17]*Id.*

would create the *perception* that either the first or the second court was misled.'"[18]  Third, the court should determine whether the party "would gain an unfair advantage in the litigation if not estopped."[19]  While these factors may inform the Court's decision, they are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts."[20] Judicial estoppel should be applied "both narrowly and cautiously."[21]

### A.      Piercing the Corporate Veil

In order for the judicial estoppel defense to apply here, the Court must find that the corporate veil between VMR and Tagliapietra should be pierced so that Tagliapietra's actions can be imputed to VMR.  VMR makes no argument in its response to the summary judgment motion on piercing the corporate veil and does not dispute any of the relevant facts with respect to this analysis.  Therefore, they have waived this argument.

Even absent this waiver, the Court finds that piercing the corporate veil is appropriate under these circumstances.  The relevant factors under Kansas law  factors are:

> (1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.[22]

---

[18]*Id.*

[19]*Id.*

[20]*New Hampshire,* 532 U.S. at 751.

[21]*Hansen v. Harper Excavating, Inc.,* 641 F.3d 1216, 1227 (10th Cir. 2011) (quotation omitted).

[22]*Amoco Chems. Corp. v. Bach,* 567 P.2d 1337, 1341–42 (Kan. 1977).

Mitchell points to Tagliapietra's deposition testimony where he admits that he considers himself and VMR one and the same, he is VMR's sole shareholder and decisionmaker, and he considers VMR a "shell" corporation.  There has been sufficient evidence of undercapitalization of this one-man corporation; indeed, Tagliapietra testified at the hearing about extensive commingling of funds between himself and VMR.

The uncontroverted facts are that the sole purpose of VMR is to receive royalties under this Agreement and VMR has never had any business since incorporation other than being a party to the Agreement; royalties are its sole source of income.  VMR has never owned any real property or physical assets.  Tagliapietra is personally funding VMR's prosecution of this case, as VMR closed its only checking account in 2005 or 2006.  There is also an absence of corporate records and a failure to observe corporate formalities.  According to Tagliapietra, VMR held informal board meetings "probably on a quarterly basis."  But VMR took board meeting notes only for the original meeting and there is no record of any other meetings with the VMR Board of Directors.  Tagliapietra filed all documents on behalf of VMR with the State of Kansas and after 2002, he personally paid all filing fees with the State of Kansas on behalf of VMR.  And finally, counsel for VMR at the May 24th hearing explicitly agreed that piercing the corporate veil was appropriate in this case.  Considering these factors, the Court easily finds that the doctrine applies here.

**B.  Failure to Disclose Potential Lawsuit**

Mitchell's first ground for applying judicial estoppel is a traditional theory of judicial estoppel—that Tagliapietra knew about his potential lawsuit in this case during the pendency of his Chapter 7 bankruptcy proceeding and failed to disclose it to the Trustee.  VMR responds that

Tagliapietra had no way of knowing of the potential claims in this case at the time he filed his bankruptcy petition on October 14, 2005, therefore, he was under no duty to disclose it to the Trustee.

In a number of cases, the Tenth Circuit has addressed the use of judicial estoppel against a plaintiff who failed to include a lawsuit as an asset on their previously-filed bankruptcy schedules.[23]  The bankruptcy estate includes legal or equitable interests of the debtor "in property as of the commencement of the case."[24]  Fed. R. Bankr. P. 1007(h) provides that "[i]f, as provided by § 541(a)(5) of the Code, the debtor acquires or becomes entitled to acquire any interest in property, the debtor shall within 14 days after the information comes to the debtor's knowledge or within such further time the court may allow, file a supplemental schedule in the chapter 7 liquidation case."  11. U.S.C. § 541(a)(5) defines the referenced property as:

> (5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date--
> (A) by bequest, devise, or inheritance;
> (B) as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or
> (C) as a beneficiary of a life insurance policy or of a death benefit plan.

VMR argues that none of these events are applicable to the claims made in this case against Mitchell because the claims in this case are entirely based on royalties owed for Mitchell's TLV product; that product was not created, marketed, or sold until after the Chapter 7 petition was

---

[23]*See, e.g.*, *Paup v. Gear Prods., Inc.*, 327 F. App'x 100 (10th Cir. 2009); *Adese v. DCT, Inc.*, 280 F. App'x 691 (10th Cir. 2008); *Eastman v. Union Pacific R.R.*, 493 F.3d 1151 (10th Cir. 2007); *Autos, Inc. v. Gowin*, 244 F. App'x 885 (10th Cir. 2007).

[24]11 U.S.C. § 541(a)(1).

filed.

The Court agrees that Tagliapietra had no duty to disclose the potential lawsuit in this case as an asset.  The evidence presented on the briefs and at the hearing make clear that Tagliapietra did not learn about the existence of Mitchell's TLV product until November 2005, after he filed his bankruptcy petition.  And the claims against Mitchell are explicitly tied to royalties for Mitchell's TLV product, not on royalties owed for the iNTOTAL product.  While Mitchell has presented evidence that Tagliapietra confronted Mitchell about its failure to pay royalties prior to filing his bankruptcy petition, it is clear from the timeline of events that these inquiries related strictly to royalties owed on iNTOTAL, as the iNTOTAL payments stopped in September 2005.

Mitchell presented no evidence upon which a reasonable jury could conclude that Tagliapietra was aware of the potential for royalty payments for the TLV product prior to October 14, 2005.  The claims in this case seek damages for royalties due under the 1998 Agreement, royalties that are only due on eligible revenue, defined as "revenue collected by Mitchell from the sale or license" of the product.  The evidence presented on summary judgment shows that royalties could not have become due on the TLV product until November 2005 at the earliest, when TLV was released to the public.  This was not property of the debtor "as of the commencement" of the bankruptcy case because VMR had no legal right to relief until the breach occurred.[25]  Because post-petition claims are not subject to disclosure, judicial estoppel is

---

[25]*See In re Burgess*, 438 F.3d 493, 496 (5th Cir. 2006); *see also In re Cohen*, No. 7-10-12616 JR, 2012 WL 1192779, at *4 (Bankr. D.N.M. Apr. 10, 2012) (explaining that causes of action accruing after the bankruptcy case is filed belong to the debtor).

not appropriate with respect to the failure to disclose such post-petition claims.[26]

Mitchell argues that Tagliapietra had a continuing duty to disclose claims that arose during the pendency of the bankruptcy case.[27]  Under 11 U.S.C. § 541(a)(1), state law determines what interests of the debtor become "property of the estate."[28]  In this case, California law determines accrual.  A cause of action for breach of contract under California law accrues at the time of breach.[29]  Given the theory of this case, VMR's cause of action did not accrue until the TLV product was sold and Mitchell failed to pay VMR royalties.  The evidence is uncontroverted that the product was first disclosed at the November 2005 NACE trade conference.  Since the breach did not occur until after Tagliapietra filed his bankruptcy petition, it was not part of the bankruptcy estate and Tagliapietra was not required to disclose it as a potential asset.[30]  The Court declines to apply judicial estoppel based on Tagliapietra's failure to disclose his potential claims in this case.

## C.     Failure to Disclose Stock Value

Mitchell's second ground for applying judicial estoppel relates to Tagliapietra's disclosure of the value of VMR stock as 0.00 on his bankruptcy schedules.  Mitchell argues that the stock valuation is inconsistent with VMR's theory in this case that it is entitled to up to $4.5

---

[26]*Id.*; *see also Watkins v. Wells Fargo Bank*, No. 3:10-1004, 2011 WL 777895, at *13 (S.D. W. Va. Feb. 28, 2011).

[27]*See Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285–86 (11th Cir. 2002).

[28]*In re Smith*, 293 B.R. 786, 789 (Bankr. D. Kan. 2003).

[29]*See, e.g.*, *Cochran v. Cochran*, 56 Cal. App. 4th 1115, 1120 (1997).

[30]The cases cited by Mitchell all deal with claims that accrued, and for which the debtor had knowledge, prior to filing the bankrtupcy petition.  *E.g.*, *Burnes*, 291 F.3d at 1285–86; *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 784–85 (9th Cir. 2001).

million in royalty payments under the Agreement that was in place at the time Tagliapietra filed his bankruptcy petition.  Unlike the potential lawsuit, there is no question that Tagliapietra's VMR stock was part of the bankruptcy estate—it was disclosed on the schedules as an asset. Instead, the issue is whether Tagliapietra's position in 2005 that the value of the stock was 0.00 is at odds with VMR's position in this lawsuit, that VMR is entitled to damages up to $4.5 million.  VMR asserts that Tagliapietra had no reason to believe the value of his VMR stock was worth anything at the time he filed his bankruptcy petition in 2005.

Courts will find the failure to fully disclose assets to the bankruptcy court inadvertent or mistaken "only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment.  Where a debtor has both knowledge of the claims and a motive to conceal them, courts routinely, albeit at times *sub silentio*, infer deliberate manipulation."[31]  Of course, under this ground, the Court is not concerned with Tagliapietra's knowledge of potential claims, but instead with his knowledge of the value of VMR stock.

The Court first must determine whether Tagliapietra's VMR stock valuation of 0.00 is inconsistent with the position taken by VMR in this case that it is entitled to up to $4.5 million in damages.  The Court easily finds that these positions are inconsistent.  At oral argument, the Court asked VMR to identify the key provisions of the Agreement that it believes support its interpretation on the breach of contract claim that Mitchell owes royalties, not just on the sale or license of VMR's iNTOTAL product, but on any other product that includes VMR's "concepts" disclosed under the software development agreement.  VMR's breach of contract theory relies on section 8.1 of the contract, which provides that "VMR retains all right, title and interest in, and

---

[31]*Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1157 (10th Cir. 2007) (quotation and citations omitted).

to, any pre-existing software tools, utilities, concepts, techniques, text, research or development methods that VMR used in or applied to the development of the TLSS Product (the "Pre-Existing Materials")." Because the TLV product includes concepts, or "preexisting materials," VMR alleges that Mitchell owes VMR royalties on the sale or license of the TLV product.[32]

Tagliapietra was asked during his deposition, "when the complaint was filed on October 5th of 2009, did you believe that the statement that 'Mitchell owes VMR,' let's say 'up to $4 million in royalties' was an accurate statement?" Tagliapietra responded that he did "believe that to be an accurate statement."[33] Then, he was asked whether the "preexisting materials" owned by VMR have any value:

> Q      What value do they have? I'm not asking for a dollar
>          number. I'm asking for --
> A      Four million dollars' worth.
> Q      Okay. And you were entitled, according to your
>          interpretation of the contract, the-the- the—excuse me—the
>          preexisting materials, all the way back in 1998. Correct?
> MS. KANE: Object to form.
> THE WITNESS: Those preexisting materials existed in 1996 and
> 1997.[34]

Plaintiff's position in this case is that it is entitled to damages for breach of contract based on the value of VMR's preexisting materials; materials that existed at the time the contract was entered into. Tagliapietra contends that any product sold or developed by Mitchell that uses TLSS concepts requires Mitchell to pay VMR a royalty under the 1998 Agreement. On this basis, VMR seeks damages in this case.

---

[32]*See, e.g.*, Doc. 93 at 20, 35.

[33]Doc. 84, Ex. 1 at 234.

[34]*Id.* at 234–35.

VMR argued at the hearing that the Court should not give weight to Tagliapietra's deposition testimony because (1) he clarified during his testimony at the May 24th hearing that he meant that $4 million was the value to Mitchell, not to VMR, and (2) he did not own a patent or a copyright on those materials, so they could not be sold to third parties and therefore hold no value.  Tagliapietra's first argument is unpersuasive.  First, his deposition testimony clearly did not qualify his valuation of the preexisting materials.  He was responding to a line of questions about his potential recovery in this case; a recovery that is only made possible if the preexisting materials, as defined in the Agreement, are valuable to VMR.  There would be no reason to carve out a right to preexisting materials in paragraph 8.1 if they held no value to VMR.  VMR's summary judgment evidence supports that this is its position—it cited deposition testimony in support of its position that paragraph 8.1 was negotiated in order to protect VMR in the event Mitchell decided to try to develop their own product with iNTOTAL and that a royalty was to be paid on any subsequent product utilizing the TLSS concepts.  Likewise, VMR's argument that the preexisting materials have no value without a copyright or patent is unavailing.  This lawsuit is based on the premise that the preexisting materials have value under the plain language of the Agreement.  Certainly the Agreement had value that could be assigned, even in the absence of termination.

The evidence presented on summary judgment and at the May 24th hearing establishes that Tagliapietra's stock valuation of VMR in October 2005 and during the pendency of his bankruptcy case was incorrect.  According to Tagliapietra, he valued the stock at 0.00 because he was no longer receiving royalty payments.  Yet, in this lawsuit, he maintains that the preexisting materials themselves hold value and that VMR owned these preexisting materials prior to

October 14, 2005.  This is the basis for his breach of contract claim—that Mitchell used those preexisting materials to develop the TLV product.[35]

The United States Bankruptcy Court in the Northern District of Alabama has explained that uncertainty about valuation on bankruptcy schedules should be explained:

> [B]ankruptcy schedules are representations of hard facts about which there should be little or no equivocation, and to the extent there is uncertainty, it should be explained.  While the value assigned to an asset may be subject to a more forgiving standard because value is often based on opinion, the disclosure and identification of an asset are absolute, with no room for unexplained ambivalence.[36]

The parties dispute whether the $4.5 million royalty cap is the proper valuation of VMR stock. Whether the maximum royalty provision in the Agreement is the correct valuation of the stock is not relevant for purposes of this analysis.  The fact that the preexisting materials themselves had value means that VMR was worth <u>something</u> at the time Tagliapietra filed his petition for bankruptcy.  Instead, Tagliapietra valued the stock at 0.00 and never informed the Trustee that VMR was a party to the Agreement, much less that VMR owned valuable preexisting materials.[37]

In fact, the record reflects that Tagliapietra misled the Trustee about the nature of VMR

---

[35]The Court also notes that there is other undisputed evidence that Tagliapietra should have valued the VMR stock at greater than 0.00 in October 2005.  While the royalty payments on iNTOTAL had stopped, he had not yet been provided with an explanation by Mitchell and was not yet aware that Mitchell had stopped using iNTOTAL—he did not learn this until December 2005.  And Tagliapietra suspected he had a claim for royalties on the TLV product by 2007, during the pendency of the bankruptcy action.  Yet, despite two separate independent possibilities of VMR revenue, he never represented to the Trustee that VMR had any value greater than 0.00.

[36]*In re Bishop*, No. 03-80636-JJR, 2009 WL 348844, at *3 (Bankr. N.D. Ala. Feb. 6, 2009) (citations omitted).

[37]*In re Engel*, 246 B.R. 784, 790 (Bankr. M.D. Pa. 2000) (finding bad faith misconduct in valuing stock on bankruptcy schedule far below a known sales price without disclosure of potential sale to the Trustee).

and the extent to which he commingled personal funds with those of VMR.  There is no indication in the record that Tagliapietra made the Trustee aware of the existence of the 1998 Agreement, despite admitting in this case that royalties under the contract was VMR's only source of income.  During the April 3, 2006 creditors meeting, counsel for Tagliapietra provided the Trustee with an escrow closing statement from a refinancing in August 2003, for approximately $101,000.[38]  Counsel told the Trustee that this money was transferred into the VMR accounts and used "for the operation of the business."  Tagliapietra stated under oath at this creditors meeting that the money was documented as a loan and "was used to pay utilities, interest payments on other loans."  He also stated that VMR "cannot" repay that loan.  Tagliapietra went on to explain that after recovering from a severe back injury that had prevented him from working for a couple of years, he "drew on any assets that were available to me to try and at—in 2003, I had gotten to the point where—of my health—where I could re-engage in business and try to relaunch the business."  Yet, when asked about this exchange at the May 24th hearing, Tagliapietra testified that VMR did not have utilities in a separate office space, as he was working out of his home after 2001.  He testified that when he represented to the Trustee that VMR used the money to pay utilities, he was referring to the portion of his home utilities that VMR was responsible for.  And he further testified that when he represented that VMR paid interest on other loans, he meant the loans listed on his bankruptcy schedule—personal loans, including his home loan.  Tagliapietra further testified that these loan proceeds were used for "expenses," but could not identify anything specific.  In fact, on cross

---

[38]Ex. 2.  Tagliapietra testified on May 24th that his home was refinanced by his financial investor and that he signed a promissory note to her for the proceeds.

examination, Tagliapietra acknowledged that his personal funds were entirely commingled with his VMR funds.  These clarifications were not made to the Trustee.

Tagliapietra ultimately discharged debts in the amount of $1.3 million.  The Court finds that this discharge was made without the Trustee having a full and complete picture of Tagliapietra's interest in VMR, as the facts have established in this case.  If this Court accepted Tagliapietra's position here that he may be entitled to damages in excess of $4 million based on the use of VMR's preexisting materials, it would most certainly create the perception that either this Court or the bankruptcy court had been misled about the true value of VMR.  The Court finds that Tagliapietra would have an unfair advantage in this lawsuit if not estopped, as he has been able to discharge all of his personal debt based, in part, on the representation that he had no interest in VMR that could be used to satisfy his debts.  Tagliapietra testified at the May 24th hearing that he began to suspect he had claims in this case based on the TLV product in 2007.  He became convinced that he had a claim in the summer of 2009.  Again, Tagliapietra failed to inform the Trustee during the pendency of his bankruptcy case that the value of his VMR stock was greater than 0.00.  The fact that he knew of the potential claims in this case based on VMR's valuable preexisting materials and waited until after his debts were discharged to file the complaint evidences a motive to conceal them from the Trustee and gain a windfall—he stands to gain all of the relief in this action while his creditors receive no benefit.  Given the facts presented on summary judgment, the Court finds that all of the relevant factors for applying judicial estoppel are present.  Defendant has sustained its burden on the affirmative defense, therefore, summary judgment is granted in favor of Defendant.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for

Summary Judgment (Doc. 83) is **granted**.  Plaintiff's Motion for Summary Judgment (Doc. 85) is **denied**.

IT IS FURTHER ORDERED that Plaintiff's Motion to Exclude the Expert Testimony of J. Todd Trivett (Doc. 100) and Motion to Exclude the Expert Testimony of Larry C. Nilson (Doc. 101) are **denied as moot**.

IT IS SO ORDERED.

Dated: June 7, 2012

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE