## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| VEHICLE MARKET RESEARCH, INC.,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| vs.    ) | Case No. 09-2518-JAR |
| ) | |
| MITCHELL INTERNATIONAL, INC.,    ) | |
| ) | |
| Defendant.    ) | |
| ) | |

## MEMORANDUM AND ORDER

This is a dispute between Plaintiff Vehicle Market Research, Inc. ("VMR") and Defendant Mitchell International, Inc. ("Mitchell") over whether Mitchell owes VMR royalties under a software development contract.  VMR brings claims against Mitchell for breach of contract and breach of the covenant of good faith and fair dealing under California law; Defendant denies that it breached the contract and violated the implied covenant of good faith and fair dealing and seeks a declaratory judgment.  The parties originally filed cross-motions for summary judgment in 2012.[1]  In addition to arguing the merits of the contract claims, Mitchell argued that Plaintiff should be judicially estopped from recovering in this case because VMR's sole shareholder, John Tagliapietra, failed to disclose the potential value of his VMR stock during the course of his personal bankruptcy proceedings based on the unpaid royalties that form the basis of VMR's damages in this case.  After conducting a hearing, the Court granted Mitchell's motion on the sole basis of judicial estoppel; it did not reach the merits of the contract

---

[1]Docs. 83, 85.

claims.  On appeal, the Tenth Circuit Court of Appeals reversed this Court's summary judgment ruling on judicial estoppel, and remanded the case for further proceedings in accordance with its opinion.

The parties participated in a pretrial conference with Magistrate Judge Rushfelt on February 2, 2015, and a Revised Pretrial Order was entered.[2]  Soon after, the parties filed a Joint Motion to Renew Motions for Summary Judgment (Doc. 137).  They ask that the Court consider the issues raised but not decided by their earlier-filed motions for summary judgment.[3]  Rather than requiring them to file new briefs, the parties ask that the Court reconsider the previously-filed briefs, Docs 83–86, 92–93, and 97–98.  The Court grants the motion to renew as to the previously-filed and fully briefed cross-motions for summary judgment (Docs. 83, 85) on the contract issues not previously addressed by this Court.  As explained more fully below, the Court denies both motions for summary judgment, finding that the contract is reasonably susceptible to VMR's interpretation and finding further that a genuine issue of material fact exists about whether Mitchell used VMR's Pre-Existing Materials in developing the TLSS Product.

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[4]  In

---

[2]Doc. 135.

[3]Given the parties explicit request in this motion, the Court does not discuss the issue of judicial estoppel—the only issue considered in the previous summary judgment order.  On appeal, the Tenth Circuit reversed this Court's prior application of judicial estoppel on summary judgment, explaining: "Given our reluctance to invoke judicial estoppel, and keeping in mind that judicial estoppel is an affirmative defense that its proponent must prove, we conclude that in this case Mitchell has not met its burden of showing any clearly inconsistent statements that would warrant that relief."  767 F.3d 987, 989 (10th Cir. 2014) (emphasis added).

[4]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[5]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[6]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[7]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[8]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[9]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[10]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[11]  The nonmoving party

---

[5]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[6]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[7]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[8]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[9]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[10]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[11]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

may not simply rest upon its pleadings to satisfy its burden.[12]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[13] When the moving party also bears the burden of proof at trial,

> a more stringent summary judgment standard applies. Thus, if the moving party bears the burden of proof, to obtain summary judgment, it cannot force the nonmoving party to come forward with "specific facts showing there [is] a genuine issue for trial" merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact. Instead, the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case.[14]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[15]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[16] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[17]

"Where, as here, the parties file cross motions for summary judgment, [the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but

---

[12]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[13]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[14]*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[15]*Adams*, 233 F.3d at 1246.

[16]Fed. R. Civ. P. 56(c)(4).

[17]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

4

summary judgment is nevertheless inappropriate if disputes remain as to material facts."[18]  Cross

motions should be considered separately.[19]  Just because the Court denies one does not require

that it grant the other.[20]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it

is an important procedure "designed to secure the just, speedy and inexpensive determination of

every action."[21]  In responding to a motion for summary judgment, "a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

mere hope that something will turn up at trial."[22]

## II.   Uncontroverted Facts

The following facts are either uncontroverted or stipulated to in the Revised Pretrial

Order.

Mitchell provides information, workflow, and performance management solutions to

improve business processes for insurance companies and collision repair facilities.  At one time,

it claimed to serve over 30,000 collision repair facilities, independent adjusters, and other repair

chain participants and 250 insurance companies, including many of the nation's top carriers.

A total loss product is a product that assists automobile insurers in providing a fair

market value for a vehicle that has been declared a total loss, i.e. a vehicle that will cost more to

---

[18]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[19]*Ultra Clean Holdings, Inc. v. TFG-Cal., L.P.*, 534 F. App'x 776, 780 (10th Cir. 2013) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

[20]*Id.*

[21]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[22]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

repair than its value at the time of the accident.  In 1996, while an employee at Mitchell, John "Pete" Tagliapietra proposed a total loss system for the company that would be based on Auto Trader publications.  Mitchell declined to use Tagliapietra's total loss concept, but informed him that he was free to "pursue an Internet solution utilizing Auto Trader information on a regional basis so long as it does not interfere with your operational duties at Mitchell."[23]  Mitchell explicitly permitted Tagliapietra to be a passive owner or director of an organization that may be formed to pursue that opportunity, with certain restrictions.  Tagliapietra agreed in principle to providing Mitchell with the right of first refusal to sell the total loss concept directly to insurance companies under license or as an independent sales representative.

VMR, a Kansas corporation incorporated by Tagliapietra in 1997, developed its Total Loss Settlement System ("TLSS") prototype and presented it to Mitchell.  Mitchell hired Robert Douglas, a former Mitchell employee, to conduct market research analysis.  He was tasked with developing "a corporate strategy (both short and long term) for the Total Loss ('real steel') market."[24]  As part of the consulting project, Douglas accompanied Tagliapietra and Dayle Phillips, who worked for DAIS, on visits with representatives of various insurance companies.  During these visits, Tagliapietra and Phillips showed insurers the VMR prototype "as something that was going to be offered by Mitchell," and gathered information about the insurers' needs for a total loss product.  During this process, Tagliapietra participated as a Mitchell employee.  Douglas recommended that Mitchell proceed with VMR in developing TLSS and drafted a Business Plan for Mitchell for this approach.  The Business Plan was a collaborative effort

---

[23]Doc. 92, Ex. 8 ("the Monark Letter").

[24]Doc. 84, Ex. 7.

between Mitchell, VMR, and DAIS, an independent contractor.

On March 20, 1998, VMR and Mitchell executed a Computer Programming and System Integration Services Agreement (the "Agreement").  The Agreement was signed by Paul Rose, Executive Vice President and CFO of Mitchell, James Lindner, President and CEO of Mitchell, and David T. Duensing, M.D., President of VMR.  Linder testified in his deposition that he does not recall who at Mitchell helped negotiate and draft the Agreement, but believes one of the corporate attorneys would have drafted it.  Dean Ricciarduli, who was in senior project management at Mitchell at the time, testified that he was responsible for crafting the Agreement; Linder does not believe that Ricciarduli was a "creator" of the document.

The following are key provisions of the Agreement.[25]

Paragraph 1 of the Agreement provides for the scope of work to be performed:

> VMR agrees to perform for, and to provide to MITCHELL, and
> MITCHELL agrees to purchase from VMR and pay VMR for,
> Professional Services as described in Schedule A . . . required by
> MITCHELL in the design, development, production, installation, services,
> maintenance, and agreed upon enhancements of the MITCHELL Total
> Loss Settlement System (TLSS).

The Schedule A Overview provides: "VMR in conjunction with DAIS Incorporated ("Dais") acting as a MITCHELL approved independent contractor agrees to design, develop, maintain and support the Total Loss Settlement System (TLSS Product) based upon the VMR prototype system and MITCHELL/VMR product specifications."

Paragraphs 6.0, 6.1, 8.0 and 8.1 deal with ownership and use restrictions:

> **6.0 Proprietary Interest in MITCHELL Products**. It is the
> intent of the parties that MITCHELL shall own all work product,

---

[25]Doc. 3, Ex. 1.

including without limitation, software, computer programs (in Object and Source code formats) techniques, systems, methodologies, reports and records and other materials prepared for MITCHELL by VMR (Work Product) arising from the performance of the Professional Services.  The Work Product shall be deemed to have become the property of MITCHELL immediately upon its creation or invention, regardless of the form of embodiment, stage of completion, format, platform or language.  The parties intend that (I) VMR shall perform all Professional Services hereunder as an independent contractor . . . . VMR agrees that MITCHELL shall own all copyright, trademark, trade secret, patent and other intellectual property rights associated with or appurtenant to any Work Product discovered, created, invented or developed under this Agreement without regard to the origin of the Work Product.

**6.1** VMR covenants and agrees with MITCHELL that VMR shall neither make claim, nor have any claim, of any design, invention, patent, copyright, trade secret or other right(s), or any proprietary interest in any MITCHELL product on which, or for which, it may perform Professional Services hereunder unless expressly agreed upon by both parties in writing. Nothing in this Agreement shall be construed as giving VMR or any Personnel, or resulting in VMR or any Personnel having any proprietary or any other ownership interest, in any of TLSS or Work Product. . . .
. . . .

**8.0 Non Disclosure, Confidentiality and Use Restrictions**: . . . . MITCHELL shall keep confidential, and not disclose to any third party and, except as specifically authorized in this Agreement shall not use Confidential Information of VMR provided to MITCHELL by VMR; provided however, MITCHELL may freely use and shall have a perpetual, paid-up nonexclusive license to use any information, know how or trade secrets that are incorporated by VMR into the TLSS Product, any deliverable or Work Product or as part of the Professional Services hereunder.  The reservation of VMR's rights in the VMR Confidential Information shall not be deemed to limit or abrogate in any way any of MITCHELL's rights set forth in Paragraphs 6 or 8 hereof.

**8.1 Ownership of Materials and Intellectual Property**: During the term of this Agreement and upon completion of all payments due, termination, cancellation, or expiration of this Agreement, but subject to the provisions of Paragraph 28 hereof, VMR shall immediately turn over all items (including the TLSS Product, Work Product or work in process) in its possession which were prepared pursuant to this Agreement or made available to VMR . . . used in developing the TLSS Product and Work

8

Product and all rights, title, and interest or other materials furnished to VMR by MITCHELL during the course of VMR performing Professional Services, and all copies thereof. . . .

Notwithstanding the foregoing, VMR retains all right, title and interest in, and to any pre-existing software tools, utilities, concepts, techniques, text, research or development methods that VMR used in or applied to the development of the TLSS Product (the "Pre-Existing Materials").

VMR hereby grants MITCHELL an exclusive right and license to modify, adapt, reproduce, use and distribute the Pre-existing Materials as part of the TLSS-Product and as part of any adaptations, updates, enhancements or other derivative works based thereon.

The Exit Clause in Paragraph 29 of the Agreement provides that "Where MITCHELL terminates this Agreement as provided in this Paragraph, MITCHELL shall relinquish its ownership interest in the Work Product (but not Confidential Information), if any, to the date of termination, and VMR may freely use the Work Product (but not the Confidential Information) in the operation of its business."

Schedule A provides for payment by Mitchell to VMR under the Agreement, including a royalty on "Eligible Revenue until a maximum cumulative total of $3,500,000 is paid out based upon the following royalty rate."  "Eligible Revenue" is defined in Schedule A as

revenue collected by MITCHELL from the sale or license of the TLSS Product as well as related Ancillary Databases for the applicable year, relating to invoices issued of, from or for the TLSS Product and Ancillary Databases, net of uncollectible amounts, returns (including out-of-pocket expenses), allowances, credits, cash, quantity and other trade discounts, shipping and insurance charges invoiced to a purchaser of services, and sales, use, value added or similar taxes to the extent borne by MITCHELL, as calculated in accordance with generally accepted accounting principles, consistently applied.

Schedule A further provides that "[i]n no event will the transaction royalty paid to VMR be less than $1.00 per transaction.  MITCHELL shall make all royalty payments hereunder on a monthly basis in accordance with its standard financial and accounts payable policies."  In 2002, the

9

parties executed an Amendment to the Agreement, increasing the maximum cumulative royalty payment to $4,500,000.

VMR developed TLSS into a prototype and a total loss product, the iNTOTAL product, which were both delivered to Mitchell.  Dais developed the source code for the TLSS product. In 1999 or 2000, the completed TLSS product was released and marketed under the trade name iNTOTAL.   Mitchell paid VMR royalties based on revenue obtained from the use of the iNTOTAL product.  Tagliapietra resigned from his senior executive position at Mitchell in March 2000.

In early 2000, Mitchell became unhappy with the quality of the software development performed by Dais for the source code of the TLSS product, but did not file a complaint or discrepancy report—a procedure provided for in the Agreement for complaining about software problems.  In September 2000, Mitchell employees believed iNTOTAL was not viable because "the values created are not reflective of the market."  It is controverted whether this problem was due to the product, or to the acquisition of outside data by Mitchell.  From 2003, until it was taken off the market, iNTOTAL "required human intervention with every claim."[26]  The product did not obtain VINs or sold data from Auto Trader, so Mitchell was required to manually contact car dealers to find out the cars on their lots, asking prices, and sale prices.  Lindner contends that "[i]t was a totally unscalable business model."[27]

Mitchell began developing its own total loss product in 2003 and by October 2005, Mitchell released the product to the market under the name Total Loss Valuation ("TLV").

---

[26]Doc. 92, Ex. 7 at 40:3–6.

[27]Doc. 92, Ex. 2 at 151:17–25.

Mitchell subsequently changed the name of TLV to WorkCenter Total Loss™ (hereinafter "TLV").  Tamara Sharpe was a Product Manager on the Total Loss development team in 2004. She testified that "[t]he TLV was a new product that was designed and developed to meet the market needs in overcoming the deficiencies that were found to be in the iNTOTAL product."[28] She testified that TLV was not an enhancement of iNTOTAL, but was a separate and new product.  Mitchell partnered with the Power Information Network ("PIN"), a division of J.D. Power & Associates, in the development of the TLV product.  Mitchell did not use PIN's database with the iNTOTAL software.  She admitted that certain "concepts" between iNTOTAL and TLV were the same.

Mitchell hired the software development company Infogain to help develop TLV. Infogain is a services company, so it does not have any specialized knowledge regarding the industries for which it creates software.  Infogain relied on Mitchell to explain the purpose and nature of the product and to explain the industry.  It is undisputed that TLV and iNTOTAL were different products that were written in different code languages.  There was no literal copying of the VMR-developed source code into TLV.  But several Mitchell employees recall that iNTOTAL was reviewed by the Mitchell developers and by Infogain in order to understand the ideas behind what a total loss system should entail, and to be able to write requirements and specifications for the TLV product.

In 2011, Infogain included on its website a document entitled "White Paper SOA in Insurance Industry,"[29] which addresses how Service Oriented Architecture ("SOA") can help

---

[28] Doc. 92, Ex. 5 at 84:15–18.

[29] Doc. 86, Ex. 19.

insurers integrate large numbers of independent IT systems to serve their business. Mitchell is

cited in this report as a case study. The white paper states:

> Mitchell had a large number of independent product lines which used to
> perform specific tasks. These products were written in older technologies
> . . . .  With the increasing demand to market and customer expectations, it
> was becoming difficult for Mitchell to respond rapidly with huge
> independent set of products written in older technologies.
>
> . . . .
>
> Mitchell contacted Infogain in 2004 to re-architect their existing
> infrastructure and make it SOA enabled. Infogain and Mitchell architect
> teams together prepared a SOA adoption strategy and roadmap for
> Mitchell and suggested to use WLI as the integration layer.
> By using WLI . . . Infogain begins to streamline Total Loss claim process
> for Mitchell as the first application of SOA. While developing Total Loss
> claim process Infogain identified and developed the basic technical
> services that could potentially be required by other processes or
> products.[30]

Rakesh Verma works for Infogain as an Engagement Director. He helped work on the Mitchell

TLV project and was Mitchell's primary point of contact with Infogain and the offshore

resources. Verma defined "re-architecturing" as changing software code from one language to

another, and later testified that it refers to changing a product from one language to another but

keeping the same design and workflow. In 2004, the only Mitchell product Verma was working

on was the TLV product.

Lindner testified that he gave a directive not to use the iNTOTAL product in developing

TLV and that Infogain employees should not have been shown any part of the iNTOTAL

product, including the TLSS prototype, in relation to their work developing TLV. He testified

that his business ethics dictated that this was the right thing to do, and that "the TLSS Product

---

[30]*Id.* at 16.

had failed us, and so we needed to start something completely from scratch.  I had made a mistake.  I chose the wrong alternative, and now I had to pay the piper, developing a product from scratch."[31]  He believed under the contract that if the Mitchell employees did in fact use the iNTOTAL product or prototype in developing the new product, a royalty would be owed.

At some point in 2005, Mitchell stopped selling the iNTOTAL product and stopped paying royalties altogether to VMR.  Mitchell never notified VMR that it was terminating the 1998 Agreement pursuant to the Exit Clause and never did return VMR's prototype or work product.

## III.    Discussion

### A.      Breach of Contract Claim

VMR claims that Mitchell breached the Agreement by failing to pay VMR royalties on its new TLV product.  VMR does not allege that Mitchell copied or stole the TLSS product itself, but instead contends that Mitchell utilized the TLSS "concepts" in developing TLV by referencing iNTOTAL and by "re-architecturing" the source code.  It argues further that Mitchell breached the contract by failing to return VMR's work product as required under the Exit Clause.  Mitchell denies that it copied the TLSS source code, that the Agreement required it to pay royalties on the use of "concepts," that such concepts were unique, or that the concepts belong to VMR under the language of the Agreement.  Mitchell further argues that there is a genuine issue of material fact about whether the concepts were incorporated into Mitchell's TLV.

---

[31]Doc. 86, Ex. 5 at 168:2–7.

1.      **Contract Interpretation**

The parties agree that California law governs VMR's claims in this case based on Section 24 of the Agreement.  The elements for a claim of breach of contract under California law are: (1) the existence of a contract; (2) the plaintiff's performance or excuse for nonperformance; (3) breach; and (4) damages caused by the breach.[32]  The parties agree that a contract existed.  The issue on summary judgment is whether Mitchell breached the contract, which requires the Court to consider the scope of VMR's entitlement to royalties under the terms of the Agreement.[33]

Under California law, contract interpretation must "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."[34]  The mutual intention of the parties is "to be inferred, if possible solely from the written terms of the contract."[35]  But extrinsic evidence may be admissible to determine the parties intent:

> The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.
> Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered

---

[32]*See Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

[33]The Court agrees with VMR that the 1998 Agreement governs this dispute, and not Tagliapietra's preexisting Employment Agreement.  The 1998 Agreement contains an integration clause and is specific to the intellectual property at issue in this case.

[34]Cal. Civ. Code § 1636; *see, e.g.*, *Wolf v. Walt Disney Pictures & Tele.*, 76 Cal. Rptr. 3d 585, 601 (Cal. Ct. App. 2008).

[35]*Progeny Ventures, Inc. v. W. Union Fin. Servs., Inc.*, 752 F. Supp. 2d 1127; 1132 (C.D. Cal. 2010); *see also* Cal. Civ. Code § 1638.

14

extrinsic evidence which is relevant to show whether the contract
is reasonably susceptible of a particular meaning. Indeed, it is
reversible error for a trial court to refuse to consider such extrinsic
evidence on the basis of the trial court's own conclusion that the
language of the contract appears to be clear and unambiguous on
its face. Even if a contract appears unambiguous on its face, a
latent ambiguity may be exposed by extrinsic evidence which
reveals more than one possible meaning to which the language of
the contract is yet reasonably susceptible.

Extrinsic evidence is thus admissible to interpret the
language of a written instrument, as long as such evidence is not
used to give the instrument a meaning to which it is not
reasonably susceptible. Where the interpretation of contractual
language turns on a question of the credibility of conflicting
extrinsic evidence, interpretation of the language is not solely a
judicial function.[36]

The parties dispute whether the Agreement requires Mitchell to pay royalties for its use

of the TLSS concepts. VMR contends that the parties negotiated and agreed that VMR would

retain rights to "TLSS concepts incorporated in the prototype and iNTOTAL product." In

support of this contention, VMR relies on paragraph 8.1 of the Agreement, and on the testimony

of Mitchell employees that paragraph 8.1 was negotiated so that VMR would retain any and all

rights to the TLSS concepts licensed by Mitchell and would thus be paid royalties if those

concepts were later used by Mitchell in a new product. VMR also points to a version of

Mitchell's Product Development Plan ("PDP") for TLV to show that it intended to pay VMR

royalties on the TLV product. Mitchell contends that Schedule A does not support VMR's

interpretation, and that the Court should not admit extrinsic evidence to supplement the plain

terms of the contract.

The first step under California law is determining "whether the disputed language is

_____

[36]*Morey v. Vannucci*, 75 Cal. Rptr. 2d 573, 578–79 (Cal. Ct. App. 1998) (quotations and citations omitted).

'reasonably susceptible' to the interpretation urged by the party.  If it is not, the case is over."[37]

VMR relies on the following language in paragraph 8.1 in support of its contract interpretation:

"Notwithstanding the foregoing, VMR retains all right, title and interest in, and to any

pre-existing software tools, utilities, concepts, techniques, text, research or development methods

that VMR used in or applied to the development of the TLSS Product (the "Pre-Existing

Materials")."[38]  "Pre-Existing Materials" is defined as "software tools, utilities, concepts,

techniques, text, research or development methods that VMR used in or applied to the

development of the TLSS Product."[39]

There is no provision for royalties in paragraph 8.1 of the contract.  But the rules of

contract interpretation dictate that the contract must be read as a whole "so as to give effect to

every part, if reasonably practicable, each clause helping to interpret the other."[40]  Payment

under the contract is dictated by Schedule A, according to paragraph 1.0.  Schedule A refers to

VMR and Mitchell's development of the TLSS Product "based upon the VMR prototype system

and MITCHELL/VMR product specifications," and  provides that Defendant "will pay VMR a

royalty on all Eligible Revenue until a maximum cumulative total . . . is paid out" based on a

royalty schedule.  "Eligible Revenue" is defined in Schedule A as revenue collected by

Defendant "from the sale or license of the TLSS Product as well as related Ancillary Databases

for the applicable year."  Under the terms of the contract, then, royalties are due for revenue

---

[37]*Halicki Films v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1223 (9th Cir. 2008) (quoting *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 132 Cal. Rptr. 2d 151, 157 (Cal. Ct. App. 2003)).

[38]Doc. 3, Ex. 1 ¶ 8.1.

[39]*Id.*

[40]Cal. Civ. Code § 1639.

derived from the sale or license of the "TLSS Product."

Pre-Existing Materials for which VMR retained a property interest clearly included any "concepts" that VMR used in or applied to the development of its "TLSS Product."  Although there is no explicit provision for royalties to be paid on the use of Pre-Existing Materials, VMR suggests that they are part of the "TLSS Product," so that if revenue is derived from their use, VMR would be entitled to royalties on that revenue.  TLSS Product is referred to in other sections of the Agreement as well, in sections 6.0, 6.1, and 8.1, however it is not explicitly defined.  In contrast, Pre-existing Materials is defined in section 8.1, after providing that VMR retains right, title and interest in the Pre-Existing Materials.  The contract then states: "VMR hereby grants MITCHELL an exclusive right and license to modify, adapt, reproduce, use, and distribute the Pre-Existing Materials as part of the TLSS Product and as part of any adaptations, updates, enhancements or other derivative works."[41]  This provision suggests that (1) the parties contemplated that Pre-Existing Materials would be incorporated into the TLSS Product, and (2) that Mitchell was only licensed to use and distribute those Pre-Existing Materials as part of the TLSS Product, not as part of a new, non-derivative product.  Moreover, the provision carving out VMR's right to Pre-Existing Materials would be superfluous if there was no penalty for Mitchell's use of those materials beyond what is licensed in paragraph 8.1.  The Court finds that there is a valid dispute about the meaning of paragraph 8.1, when read together with Schedule A's use of the term  "TLSS Product" as part of its definition of Eligible Revenue.

VMR argues that extrinsic evidence should therefore be admitted to further explain the intent behind section 8.1.  As set forth above, extrinsic evidence is only admissible to aid the

---

[41]Doc. 3, Ex. 1 at 4, ¶ 8.1 (emphasis added).

Court in contract interpretation if the parties dispute the meaning of contractual language, and the disputed language is "reasonably susceptible" to the interpretation urged by VMR.[42]  The Court must provisionally receive the extrinsic evidence to make this determination.

> If the evidence tends to prove a meaning of which the language of the contract is not reasonably susceptible, the court may then exclude the evidence.  It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence.[43]

Provisionally considering VMR's extrinsic evidence, the Court finds that the evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible.  As an initial matter, the evidence is entirely inconsistent as to who was involved in the contract negotiations on each side.  Dean Ricciarduli, who was in senior management at Mitchell at the time, testified that he was responsible for crafting the Agreement along with Douglas for Mitchell, and that they primarily negotiated with Dayle Phillips for VMR.   Phillips denies any role in the contract formation.  Lindner does not believe that Ricciarduli was a "creator" of the document; he does not recall who at Mitchell helped negotiate and draft the Agreement, but believes one of the corporate attorneys would have drafted it.  Douglas testified that he helped Ricciarduli negotiate the agreement on behalf of Mitchell, and that he worked with Duensing and Tagliapietra at VMR.  He claims to have been instrumental in structuring the deal.  Lindner, a signatory of the contract, expressly denies that Douglas, as an independent contractor, would

---

[42]*See, e.g.*, *Progeny Venutres, Inc. v. W. Union Fin. Servs., Inc.*, 752 F. Supp. 2d 1127, 1132–33 (C.D. Cal. 2010); *see also Halicki Films*, 547 F.3d at 1223.

[43]*Kucharczyk v. Regents of Univ. of Cal.*, 946 F. Supp. 1419, 1429 (N.D. Cal. 1996) (quotations and citations omitted); *see also Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 645–46 (Cal. 1968) (en banc).

have been involved in the contract negotiation.  Douglas was asked, "with respect to

understanding what the parties, VMR and Mitchell, intended when they entered into the contract,

the people we'd need to talk to would be Mr. Duensing for VMR and Mr. Rose and Mr. Lindner

for Mitchell.  Correct?"[44]  He responded, "Yes. . . .  Based on my knowledge."[45]  There is a

genuine issue of material fact about who exactly took part in the contract negotiations.

       In addition, Lindner vehemently disputes Ricciarduli and Douglas's interpretation of

paragraph 8.1.  Lindner testified that he understood the royalty provision of the contract to apply

to revenue derived from the iNTOTAL product only, which he considered synonymous with the

TLSS product for purposes of the 1998 Agreement.  He did not understand the contract to

require royalty payments for Mitchell's use of concepts, or any other Pre-Existing Materials,

except as part of the iNTOTAL Product.  He testified that he would not have signed the contract

had such a provision been included.

       Ricciarduli testified that VMR insisted on adding paragraph 8.1 to the Agreement as an

assurance that Mitchell could not take VMR's product "move on, develop their own product,

take this product in-house and develop it."  When asked if this meant that a royalty must be paid

on such concepts, Ricciarduli admitted: "That's a tough question.  And I understand the nature of

where you're going. And I like both companies. Both are great folks.  But my belief would be

that they would have continued to pay on past iNTOTAL based on the ideas and concepts that

Pete and his team brought to the table."[46]  Douglas testified that he understood royalties were to

---

[44]Doc. 92, Ex. 13 at 165:18–22.

[45]*Id.* at 166:1–4.

[46]Doc. 86, Ex. 7 at 142–44.

be paid on the use of TLSS concepts, not just revenues derived from the TLSS product itself. Mitchell points to evidence that this provision was routinely added to its licensing agreements, to rebut Ricciarduli's testimony that it was added at VMR's insistence.  It also calls into question the credibility of Ricciarduli and Douglas's testimony as to contract formation.

As set forth above, the extrinsic testimonial evidence presents a clear dispute about whether royalties are due under the contract for the use of Pre-Existing Materials.  Given the failure of the contract to specifically define TLSS Product, and the ambiguous language in paragraph 8.1 regarding whether Pre-Existing Materials are included in the definition of TLSS Product,  the Court finds that it is reasonably susceptible to the interpretation urged by VMR—that Eligible Revenue includes revenue derived from any Pre-Existing Materials that were used in or applied to the TLSS Product.  Thus, the testimonial extrinsic evidence submitted by VMR is admitted for purposes of contract interpretation under California law.

VMR also presents extrinsic evidence as to the subsequent conduct of the parties that supports its contract interpretation.  In 2003, Mitchell authored a Product Development Plan, which contained financial forecasts for its proposed TLV product in 2004, 2005, and 2006, based on pro forma estimates ("Pro Formas").  These Pro Formas include a fixed cost assumption of $1.00 per claim royalty to VMR, and VMR points to witness testimony that Mitchell assumed it would pay a royalty to VMR for revenue derived from its new product.  VMR argues that this evidence of the subsequent conduct of the parties shows that Mitchell understood a royalty payment would be required on the sale of both iNTOTAL and its own total loss product.

Mitchell points out that Ricciarduli testified that the Pro Forma document covered both iNTOTAL and TLV; Mitchell therefore argues that the line item of variable expenses relied on

20

by VMR could indicate an assumption of royalties by Mitchell on the continued sale of the iNTOTAL product.  But this argument goes to the weight of the evidence and not to its admissibility to prove contractual intent.  A reasonable jury could conclude from this evidence that Mitchell's subsequent conduct supports VMR's interpretation of the contract—the line item in the exhibit lacks any detail.  Moreover, when Ricciarduli testified about the exhibit during his deposition, he testified that he was responsible for the TLV Pro Formas and that he understood that the royalties were added on that product.  He also testified that Lindner was aware of and had read the PDP.

Mitchell raises an authentication objection, arguing that this exhibit is not the final version of the PDP because it does not contain a Mitchell executive's signature.[47]  Yet, Mitchell fails to produce the final version and offers no evidence to suggest that the final version omitted the royalty estimates to VMR.  To be considered on summary judgment, evidence must be in a form that would be admissible at trial.[48]  The authentication requirement is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."[49]  VMR points to Ricciarduli's testimony that he recalls that the PDP version he was shown during his deposition, the same one submitted on summary judgment, was approved by Mitchell executives. The Court finds that VMR has laid a sufficient foundation to establish that the PDP which included a $1.00 royalty per claim assumption was ultimately approved and relied on by

---

[47]VMR argues that Mitchell withheld the final PDP with the intent of concealing information that would hurt its case and therefore an adverse inference instruction is warranted.  The Court declines to rule on such an allegation or request outside the context of a separate, properly supported motion.

[48]Fed. R. Civ. P. 56(c)(2).

[49]Fed. R. Evid. 901; *see Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1171 (10th Cir. 2009).

Mitchell in creating a product development plan for TLV.  The Court therefore finds that this evidence is in a form that would be admissible at trial and overrules Mitchell's objection.

In sum, the Court finds that the contract is reasonably susceptible to VMR's interpretation that Mitchell was required to pay royalties to VMR under the contract for use of Pre-Existing Materials, which include concepts that VMR used in or applied to the development of the TLSS Product.  As such, the Court admits extrinsic evidence about the parties intent to consider in conjunction with the language of the contract.  Moreover, the Court finds that the language of paragraph 8.1 and Schedule A, when considered along with the extrinsic evidence, could be reasonably interpreted to mean that the TLSS Product includes VMR's Pre-Existing Materials as defined in paragraph 8.1.  Nonetheless, the Court cannot find that the extrinsic evidence commands this interpretation.  Instead, the Court finds that the issue largely turns on the credibility of the extrinsic evidence and thus presents a genuine issue of material fact about the parties' intent at the time of contracting—whether the parties intended for the Pre-Existing Materials provision to further define TLSS Product and thus subject revenue derived from Mitchell's use of such materials to royalty payments is a question for the fact finder.

In addition to its "concepts" theory of breach, VMR contends that Mitchell breached the contract by failing to relinquish its ownership interests in the "Work Product" generated by VMR, as required under the contract upon termination.  It is undisputed that Mitchell never terminated the Agreement and Mitchell argues on summary judgment that it was not required to terminate.  Indeed, the contract provides for a five-year term and states that it "will be automatically renewed each year on the anniversary date," provided that notice of intent not to

renew is submitted within 30 days of the renewal date.[50]  The Court agrees that the Exit Clause

of the Agreement provides that upon termination, Mitchell must relinquish its ownership interest

in VMR's Work Product, however, there is no language in the contract that requires Mitchell to

terminate the contract: "MITCHELL <u>may</u> terminate this Agreement at any time after the Phase 1

by providing to VMR no less than ninety (90) days written notice of its intent to terminate."[51]

Because Mitchell never terminated, and because the Agreement automatically renewed by its

own terms each year, VMR cannot establish as a matter of law that Mitchell terminated the

Agreement and was thus required to return VMR's Work Product upon termination.

 While the Court cannot find from the uncontroverted facts that Mitchell breached the

Exit Clause of the Agreement as a matter of law, it does find that this provision of the contract

creates further ambiguity as to the meaning of paragraph 8.1.  Despite the automatic renewal and

exit clause provisions, paragraph 8.1 contemplates the following scenarios for completion of the

contract: "upon completion of all payments due, termination, cancellation, or expiration of this

Agreement, but subject to the provisions of Paragraph 28 hereof, VMR shall immediately turn

over all items (including the TLSS Product, Work Product or work in process) in its possession

which were prepared pursuant to this Agreement or made available to VMR . . . ."  Perhaps the

renewal provision that allows for a thirty-day notice not to renew is considered "cancellation,"

under the contract, but other than in paragraph 8.1, the contract makes no explicit reference to

cancellation or expiration.

 For the reasons explained above, the Court finds that while the contract can be

---

[50]Doc. 3, Ex. 1 ¶ 3.0.

[51]Doc. 3, Ex. 1 ¶ 29 (emphasis added).

reasonably interpreted to require a royalty payment to VMR for the use of TLSS Pre-Existing

Materials, including concepts, it does not command that result.  A genuine issue of material fact

exists through the extrinsic evidence regarding the parties' intent in negotiating paragraph 8.1.

Therefore, the Court must next turn to Mitchell's argument on summary judgment that there is

no evidence upon which a reasonable jury could conclude that it used VMR's Pre-Existing

Materials in developing its TLV Product.

**2.      Whether Mitchell Used VMR's Pre-Existing Materials**

Mitchell next argues that VMR's concepts were not innovative or groundbreaking,

apparently in an attempt to rebut certain representations VMR made in its Complaint about the

uniqueness and novelty of its concepts.  Mitchell also references seven concepts that Tagliapietra

identified in his deposition as being incorporated into the TLV product and points to evidence,

primarily Larry C. Nilson's expert report, supporting its position that these concepts were not

new, or novel in the insurance industry.  VMR is correct that the novelty or uniqueness of the

concepts alleged to have been incorporated into the TLV product, standing alone, is not dictate

whether Mitchell breached the contract.  But if the jury determines that the contract requires

royalties for use of the Pre-Existing Materials, it will be required to examine the definition of

that term, which includes the word "concepts," and determine whether Mitchell used those Pre-

Existing Materials in developing its TLV product.  Certainly, whether the concepts at issue had

been used by other companies, or were standard concepts, is relevant to determining whether it

was part of VMR's Pre-Existing Materials used to develop the TLSS Product.

The summary judgment record presents a genuine issue of material fact about whether

VMR's Pre-Existing Materials were used to develop the TLV Product.  VMR points to the

deposition testimony of former Mitchell employees who worked on the TLV development and discussed looking at VMR materials, and utilizing certain "concepts."  VMR also points to the Infogain white paper, arguing that Infogain "re-architectured" its iNTOTAL product in order to create the TLV product.  Viewing this evidence in the light most favorable to VMR, a reasonable jury could determine that Mitchell used certain Pre-Existing Materials that belong to VMR, such as the display of information, the type of database, by allowing Infogain to reference the iNTOTAL Product as it developed the TLV Product.  To the contrary, Mitchell has come forward with evidence that the "concepts" identified by VMR were not proprietary, but were instead high-level concepts that were standard in all work loss products.  It also points to other portions of the same witnesses' deposition testimony to argue that while Infogain looked at the iNTOTAL Product to educate itself about the idea of a total loss system, it did not use any of VMR's Pre-Existing Materials in order to develop the TLV Product; instead it helped Mitchell develop an entirely new product from scratch.  Given this highly controverted evidence, the Court finds there to be a genuine issue of material fact about whether Mitchell used the VMR concepts in developing the TLV Product.  Thus, both parties' summary judgment motions must be denied on the breach of contract claim.

### B.      Breach of the Covenant of Good Faith and Fair Dealing Claim

VMR claims that Mitchell violated the implied duty of good faith and fair dealing when it allowed the TLV developers to use and review TLSS concepts in building its new product.  It points to Lindner's deposition testimony about how it would violate his own standard of business ethics for his developers to use the iNTOTAL product to develop Mitchell's new TLV product.  Under California law, a covenant of good faith and fair dealing is implied in every contract, and

"exists merely to prevent one party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made."[52]  The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of the agreement."[53]

VMR contends that the appropriate standard is whether the breaching party violated "accepted notions of business ethics."  For this proposition, VMR cites to the California Supreme Court's decision in *Freeman & Mills, Inc. v. Belcher Oil Co.*[54]  That case reconsidered whether a cause of action exists for the tort of bad faith denial of contract.[55]  After extensively reviewing California law and the criticism waged against its prior precedent, the Court overruled its previous allowance of such claims.[56]  The language cited by VMR for the proposition that violations of business ethics may give rise to a claim for breach of the implied covenant of good faith and fair dealing comes from the court's discussion of the decision it is overruling.[57]  Likewise, VMR's reliance on *Harris v. Atlantic Richfield Co.*,[58] is misplaced.  That decision also relied on the prior precedent in California that allowed claims for bad faith denial of contract,

---

[52]*Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1110 (Cal. 2000).  Although Mitchell is correct that under California law an insurer's breach of the duty of good faith and fair dealing may arise in tort, the case law does not support its contention that a contractual breach of good faith and fair dealing claim cannot arise in the non-insurance context.  *See, e.g.*, *Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669, 679–80 (Cal. 1995); *Foley v. Interactive Data Corp.*, 765 P.2d 373, 395–96 (Cal. 1988).

[53]*Guz*, 8 P.3d at 1110; *see also Avidity Partners, LLC v. State*, 165 Cal. Rptr. 3d 299, 320–21 (Cal. Ct. App. 2013).

[54]900 P.2d 669, 672 (Cal. 1995).

[55]*Id.* at 672–73.

[56]*Id.* at 679–80.

[57]*Id.* at 672 (discussing *Seaman's Direct Buying Serv., Inc. v. Std. Oil Co.*, 686 P.2d 1158 (Cal. 1984)).

[58]17 Cal. Rptr. 2d 649, 656  (Cal. Ct. App. 1993).

which "goes beyond the mere breach of contract and offends accepted notions of business ethics."[59]  Under *Freeman & Mills*, such tort claims are no longer permitted under California law.[60]

More recent California decisions have made clear that "'[t]he implied covenant of good faith and fair dealing is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.'"[61]  Breach of a specific provision of the contract is not a prerequisite to a claim for breach of the implied covenant.[62]  Instead, the Court must determine whether the conduct at issue, "though not prohibited, is nevertheless contrary to the contract's purposes and the parties' legitimate expectations."[63]

VMR also relies on licensing case law to support its generalized "business ethics" standard for good faith and fair dealing claims.  But Professor Nimmer states that the implied covenant "does not alter express contract terms or provide additional terms for the agreement."[64]  With respect to licensing, Professor Nimmer explains:

> For the licensee, the obligation of good faith prohibits conduct that

---

[59]*Id.*

[60]VMR also cites an unpublished decision from the Superior Court of New Jersey.  *66 VMD Assocs., LLC v. Melick-Tully & Assocs., P.C.*, No. L-6584-07, 2011 WL 3503160, at *3 (N.J. Super. Ct. App. Div. Aug. 11, 2011). This case does not apply California law and therefore the Court finds it of no persuasive value on this point.

[61]*Spinks v. Equity Residential Briarwood Apts.*, 90 Cal. Rptr. 3d 453, 477 (Cal. Ct. App. 2009) (quoting *Pasadena Live v. City of Pasadena*, 8 Cal. Rptr. 3d 233, 237 (Cal. Ct. App. 2004)).

[62]*Avidity Partners, LLC v. State*, 165 Cal. Rptr. 3d 299, 320 (Cal. Ct. App. 2013);  *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 937 (9th Cir. 1999).

[63]*Avidity Partners, LLC*, 165 Cal. Rptr. 3d at 320; *see also Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 728 (Cal. 1992) (en banc).

[64]Raymond T. Nimmer, Law of Computer Technology § 7.67.

27

> takes advantage of the circumstances created by the transaction in a way that unfairly disadvantages the licensor.  For example, in *SAS Institute, Inc. v. S&H Computer Systems, Inc*., a licensee's reverse engineering and copying of the organization of a complex computer program violated the licensee's obligation of good faith and fair dealing. Use of information obtained through the license in a manner that disadvantaged the licensor and yielded a competing program similar in concept was bad faith.
>
> *SAS* did not involve a distribution license, and the court stopped short of holding that the good faith obligation precludes development of a noninfringing product similar to that licensed, and entering into competition with the licensor.  In print publishing and other contracts involving intended distribution of the licensed product, an obligation not to compete ordinarily could not be inferred since the ordinary publishing context often involves simultaneous development and marketing of products which overlap in content or subject matter.[65]

As Professor Nimmer acknowledges, *SAS* did not involve a distribution license, like the license at issue in this case.  Nor does the *SAS* decision expand the scope of the duty of good faith and fair dealing in the licensing context beyond the general principles announced by the courts of California.  It recognizes that the duty is implied in every contract, and that it seeks to prohibit the parties from doing anything that would "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[66]

VMR contends that its theory of recovery for breach of the implied covenant is based upon ¶¶ 6.0 and 8.1 of the Agreement and "arises from Mitchell's admitted standard of business ethics, *i.e.*, not to use VMR's property (the concepts, Work Product, or iNTOTAL) in a subsequent total loss product without paying royalties."[67]  In the Revised Pretrial Order, VMR states that "Mitchell breached the covenant . . . by using the TLSS product and its concepts as a

---

[65]*Id.* (footnotes omitted) (discussing *SAS Inst., Inc. v. S&H Sys., Inc.*, 605 F. Supp. 816, 827–28 (M.D. Tenn. 1985)).

[66]*See SAS Inst., Inc.*, 604 F. Supp. at 828.

[67]Doc. 98 at 28.

base for its TLV product without paying royalties."[68]

      As already discussed on the breach of contract claim, paragraph 8.1 in conjunction with Schedule A may have required Mitchell to pay VMR for any revenue derived from the use of its Pre-Existing Materials.  The parties have presented conflicting evidence as to their legitimate expectations for the Pre-Existing Materials after the contract either expired or was terminated.  A reasonable jury could conclude from VMR's evidence that Mitchell injured VMR's ability to receive the fruits of the contract—i.e. royalties—by using its Pre-Existing Materials to develop its own product and by failing to return VMR's work product.  On the other hand, a reasonable jury could conclude from the evidence that Mitchell did not use VMR's Pre-Existing Materials if it finds that the contract was not intended to provide for royalties on Pre-Existing Materials, or if it finds that VMR had no legitimate expectation of royalty payments on the TLV product for the concepts that were used by Mitchell.  As such, a genuine issue of material fact exists as to this claim and the Court must deny both motions for summary judgment.

      **IT IS THEREFORE ORDERED BY THE COURT** that the parties' Joint Motion to Renew Motions for Summary Judgment (Doc. 137) is **granted**, as to the issues not addressed by the Court's previous Order on judicial estoppel.  Upon reconsideration, the Court **denies** Defendant Mitchell's Motion for Summary Judgment (Doc. 83) and **denies** Plaintiff VMR's Motion for Summary Judgment (Doc. 85).

---

[68]Doc. 135 ¶ 6(a).

Dated: <u>June 25, 2015</u>

<div align="center" style="margin-left:50%">

<u> S/ Julie A. Robinson </u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

</div>